# No. 22-1854

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA EX REL. RALPH BILLINGTON,
MICHAEL ACEVES, and SHARON DORMAN,

*Plaintiffs/Relators-Appellants*,

v.

HCL TECHNOLOGIES LTD. and HCL AMERICA, INC.

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Connecticut, No. 3:19-CV-01185
Hon. Sarah A. L. Merriam

## APPELLANTS' OPENING BRIEF

Daniel Kotchen
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
dkotchen@kotchen.com

*Attorney for Appellants
Billington, Aceves, and Dorman*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT .......................................................1

ISSUES PRESENTED ..........................................................................2

STATEMENT OF THE CASE ..............................................................3

STATEMENT OF THE FACTS ............................................................5

    I.    H1-B Visas and the Requirement for H1-B Wages. ...............5

    II.   HCL's Fraudulent and Unlawful Underpayment of H-1B Wages And Reduction Of Its Tax Obligation. .........................7

    III.  HCL's Fraudulent Applications for L-1 and B-1 Visas for Work Requiring H-1B Visas. .................................................10

SUMMARY OF THE ARGUMENT ....................................................14

ARGUMENT ......................................................................................18

    I.    Standard of Review. ..............................................................18

    II.   The False Claims Act Framework. ........................................19

        A.   1986 Amendment to the FCA. ....................................19

        B.   Judicial Reaction to the 1986 Amendments. ...............21

        C.   2009 FERA Amendments to Expand Scope of Reverse-FCA Liability Through § 3729(a)(1)(G) and "Obligations" Giving Rise to Liability Thereunder. ....26

    III.  Relators Sufficiently Pled that HCL Knowingly Avoided or Decreased an "Obligation" to Pay the Government Money. 30

A.    Relators Adequately Allege That HCL Knowingly and Improperly Decreased its Obligation to Pay H-1B Wages and Taxes. .......................................................... 33

B.    Relators Adequately Allege That HCL Knowingly and Improperly Avoided and/or Decreased its Obligation to Pay H1-B Visa Application Fees. .................................. 43

CONCLUSION ........................................................................... 68

# TABLE OF AUTHORITIES

## CASES

*American Textile Manufacturers Institute, Inc. v. Limited, Inc.* ("*ATMI*"), 190 F.3d 729 (6th Cir. 1999) ........................................................ passim

*Franchitti v. Cognizant Tech. Sols.*, No. 317CV06317PGSLHG, 2022 WL 605745 (D.N.J. Mar. 1, 2022) ("*Franchitti II*") ............................ 53, 54

*Franchitti v. Cognizant Tech. Solutions Corp.*, 555 F. Supp. 3d 63 (D.N.J. 2021) ................................................................................... passim

*Goldberg v. Danaher,* 599 F.3d 181 (2d Cir. 2010) ................................ 33

*Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923 (N.D. Cal. 2019) .... passim

*MKB Constructors v. Am. Zurich Ins. Co.*, No. C13-0611, 2015 WL 1188533 (W.D. Wash. Mar 16, 2015) ................................................... 58

*Palin v. N.Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019) ............................ 18

*Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74 (2d Cir. 2020) .... 18

*U.S. ex re. Simoneux v. E.I. DuPont de Nemous & Co.*, 843 F.3d 1003 (5th Cir. 2016) ...................................................................................... 64

*U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224 (10th Cir. 2017) ............................................................................................ passim

*U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.,* 318 F. Supp. 3d 680 (S.D.N.Y. 2018) ............................................................................ 64, 65

*U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430 (6th Cir. 2016) ...................................................................... 31

*U.S. ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.,* 336 F. Supp. 2d 430 (E.D. Pa. 2004) ...................................................................... 15, 41

*U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 WL 6908856 (S.D. Ga. Dec. 8, 2014) ................................................... 34, 35

*U.S. ex. rel. Kane v. Healthfirst, Inc.,* 120 F. Supp. 3d 370 (S.D.N.Y. 2015) ........................................................................... 29, 50, 59

*U.S. ex. rel. Kaosowitz Benson Torres LLP v. BASF* Corp., 285 F. Supp. 3d 44 (D.D.C. 2017) ........................................................ 64

*United States ex rel. Bahrani v. ConAgra, Inc.,* 465 F.3d 1189 (10th Cir. 2006) ...................................................................... passim

*United States ex rel. Bain v. Georgia Gulf Corp.,* 386 F.3d 648 (5th Cir. 2004) ............................................................................... 22

*United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.,* 865 F.3d 71 (2d Cir. 2017) ............................ 40

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.,* 839 F.3d 242 (3d Cir. 2016) ................................... passim

*United States ex rel. Ormsby v. Sutter Health,* 444 F. Supp. 3d 1010 (N.D. Cal. 2020) ...................................................... 28, 30, 31, 38

*United States ex rel. Petras v. Simparel, Inc.,* 857 F.3d 497 (3d Cir. 2017) ............................................................................... 67

*United States ex rel. Taylor v. Gabelli,* 345 F. Supp. 2d. 131 (S.D.N.Y. 2004) ............................................................................... 65

*United States ex rel. Yu v. Grifols USA, LLC,* No. 1:17CV02226 (GHW), 2021 WL 587047 (S.D.N.Y. Dec. 8, 2021) ...................... 4, 32

*United States v. Bourseau,* 531 F.3d 1159 (9th Cir. 2008) .................... 26

*United States v. Pemco Aeroplex,* 195 F.3d 1234 (11th Cir. 1999) . passim

*United States v. Q International Courier ("Quick"),* 131 F.3d 770 (8th Cir. 1997) ...................................................................... passim

*United States v. Raymond & Whitcomb Co.,* 53 F. Supp. 2d 436 (S.D.N.Y. 1999) ............................................................................... 25

*United States v. Walgreen Co.,* 591 F. Supp. 3d 297 (E.D. Tenn. 2022). 31

iv

## STATUTES

26 U.S.C. § 3111(a) ..................................................................... 35, 37, 41

28 U.S.C. § 1331 ..................................................................................... 1

28 U.S.C. § 1345 ..................................................................................... 1

28 U.S.C. § 3732(a) ................................................................................ 1

31 U.S.C. § 3729 .............................................................................. 44, 65

31 U.S.C. § 3729(a)(1)(G) ............................................................. passim

31 U.S.C. § 3729(a)(7) ....................................................... 20, 22, 27, 29

31 U.S.C. § 3729(b)(3) .................................................................. passim

8 U.S.C. § 1101(a)(15)(B) .................................................................... 11

## OTHER AUTHORITIES

David J. Ryan, *The False Claims Act: An Old Weapon with New Firepower*, 4 Annals Health L. 127, 128 (1995) .................................... 19

Dep't of Treasury, IRS, Pub. 15 (Circular E), Employer's Tax Guide (2021) ........................................................................................ 35, 37

HTC Global Services, Inc., No. 1507879 (Dep't of Labor June 9, 2009) (ALJ determination letter) ............................................................ 6, 35

Ron Hira & Daniel Costa, *New evidence of widespread wage theft in the H-1B Visa Program*, ECONOMIC POLICY INSTITUTE, Dec. 9, 2021 .......... 6

*United States v. Bourseau*, Appellee Br., 2007 WL 1577381 ...... 21, 22, 29

## RULES

Fed. R. App. P. (4)(A)(v) ......................................................................... 1
Fed. R. App. P. 30(a)(2) .......................................................................... 3

Fed. R. App. P. 4(a)(1)(A) ............................................. 1

Fed. R. Civ. P. 12(b)(6) ............................................... 3

## REGULATIONS

20 C.F.R. § 655.705(c)(1)(5) ...................................... 40

20 C.F.R. § 655.731 ............................................. 36, 41

20 C.F.R. § 655.731(a) ...................................... passim

20 C.F.R. § 655.731(b)(1)-(3) ...................................... 7

8 C.F.R. § 214.2(h)(1)(ii)(B) ...................................... 5

8 C.F.R. § 214.2(l)(1)(ii)(B) .................................... 11

8 C.F.R. § 214.2(l)(1)(ii)(D) .................................... 11

8 C.F.R. § 214(i)(1) ................................................ 5

## LEGISLATIVE MATERIALS

H.R. Rep. No. 99-660 ............................................... 20

S. Rep. No. 110-507 ................................................ 27

S. Rep. No. 111-10 .......................................... passim

S. Rep. No. 99-345 ............................................. 20, 21

# JURISDICTIONAL STATEMENT

Relators-Appellants brought their claim under the False Claims Act, 31 U.S.C. §§ 3729-3733 and the district court therefore had subject matter jurisdiction over this False Claims Act case pursuant to 28 U.S.C. § 3732(a) (False Claims Act), 28 U.S.C. § 1345 (United States as Plaintiff), and 28 U.S.C. § 1331 (Federal Question). The district court issued a final order dismissing this case with prejudice on July 28, 2022. A.34.

Relators timely filed their Notice of Appeal on August 24, 2022. A.84; Fed. R. App. P. 4(a)(1)(A), (4)(A)(v). Accordingly, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

# ISSUES PRESENTED

I.    Whether the District Court erred in dismissing Relators' reverse-False Claims Act ("FCA") claim arising from HCL's fraudulent and unlawful underpayment of H-1B visa employee wages and corresponding taxes, where HCL had a regulatory obligation to pay H-1B visa employees at least as much as similarly-situated non-visa employees and HCL falsely certified on an ongoing basis that it was doing so.

II.   Whether the District Court erred in dismissing Relators' reverse-FCA claim arising from HCL's fraudulent avoidance or decreasing of its obligation to seek and pay for H1-B visas by applying for cheaper L-1 and B-1 visas using false and fraudulent representations, and unlawfully and consistently utilizing employees to perform work requiring H-1B visas without having sought or paid for H-1B visas.

# STATEMENT OF THE CASE

Relators filed this action against Defendants HCL Technologies Ltd. and HCL America, Inc. ("HCL") on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

Relators allege that HCL was liable to the government under § 3729(a)(1)(G) of the FCA in two ways: (1) by unlawfully underpaying H-1B visa worker wages, thereby decreasing tax payments to the government; and (2) by fraudulently misrepresenting the nature of labor for which it was seeking visa authorization and thereby avoiding or decreasing H1-B visa application fees by seeking L-1 and B-1 visas for employees it then instructed to perform work in the U.S. that required a more expensive H-1B visa. A.37,51 ¶¶ 5, 64.

HCL moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on September 28, 2021. *See* District Court Dkt. 52.[1] HCL argued, *inter alia*, that the FCA was inapplicable because HCL did not have a legally cognizable "obligation" to the government under the FCA at the time of

---

[1] HCL's motion to dismiss is not included in the appendix, but may still be relied upon by the Parties and the Court per Fed. R. App. P. 30(a)(2).

its alleged false statements. *Id.* at 18-20. The district court agreed with HCL on these issues and dismissed the claims[2] on July 28, 2022. *See* A.1-33. The court held that a reverse false claim requires (1) a false statement (2) at a time that the defendant had a presently existing obligation to pay, and that Relators failed to allege "any 'established duty' at the time of the alleged misconduct." A.21 (citing *United States ex rel. Yu v. Grifols USA, LLC*, No. 1:17CV02226 (GHW), 2021 WL 587047, at *12 (S.D.N.Y. Dec. 8, 2021) and 28-29.

Relators filed a timely notice of appeal and now seek reversal of the district court's dismissal of their FCA claims under § 3729(a)(1)(G),[3] which was incorrect because: the 2009 amendments to the FCA expanded the scope of liability, abrogated cases that interpreted "obligation" too narrowly, and added a second prong to § 3729(a)(1)(G) that does not require a false statement; HCL had a regulatory and statutory obligation to pay prevailing wages and corresponding taxes on those wages, and an

---

[2] The district court did not reach or address any of HCL's other arguments for dismissal. *See* A.32.

[3] Relators also brought claims under § 3729(a)(1)(A)-(B), but Relators do not appeal the dismissal of those claims.

implied contractual, fee-based, and regulatory obligation to seek H-1B visas, and to pay H-1B visa application fees, for work requiring H-1B visas; and HCL's misconduct and false certifications were ongoing. *Cf. Franchitti v. Cognizant Tech. Solutions Corp.*, 555 F. Supp. 3d 63 (D.N.J. 2021) (denying motion to dismiss almost identical reverse false claim against an HCL competitor for fraudulent use of B-1 and L-1 visas instead of H-1B visas and underpayment of H-1B visa workers).

## STATEMENT OF THE FACTS

HCL provides information technology ("IT") services to U.S. clients. A.38-39 ¶¶ 15-17. American corporations use HCL's IT services in lieu of maintaining in-house IT personnel. A.39 ¶ 17. HCL competes for business based on price and its primary cost is employee pay. A.39 ¶ 18.

## I.  H1-B Visas and the Requirement for H1-B Wages.

H-1B visas are intended to bring foreign workers to the United States to perform services in specialty occupations when there are insufficient workers in the U.S. to perform a specific job. A.40 ¶ 22 (citing 8 C.F.R. § 214.2(h)(1)(ii)(B); 8 C.F.R. § 214(i)(1)). Employment of foreign workers on H-1B visas is highly regulated to accomplish various governmental objectives. One of those regulations—at issue in this

appeal—is the express legal requirement that employers pay H-1B workers the *higher* of (1) the actual wage the employer pays similarly employed workers or (2) the prevailing wage (i.e., the wage rate paid by other employers in the geographical area for the same work). A.40-41 ¶ 23 (citing 20 C.F.R. § 655.731(a)). This legal requirement prevents Americans from losing jobs to cheaper foreign workers, ensures that foreign workers receive a fair wage and are not exploited, and prevents the government from losing tax revenues from same. *See* Ron Hira & Daniel Costa, *New evidence of widespread wage theft in the H-1B Visa Program*, ECONOMIC POLICY INSTITUTE, Dec. 9, 2021[4]; *see also, e.g.*, HTC Global Services, Inc., No. 1507879 (Dep't of Labor June 9, 2009)[5] (ALJ determination letter finding underpayment of H-1B worker and requiring H-1B employer to pay both back wages *and* associated taxes for same).

As an express condition of applying for an H-1B visa, an employer

---

[4]     *Available at:* https://www.epi.org/publication/new-evidence-widespread-wage-theft-in-the-h-1b-program/ (last visited Nov. 29, 2022).

[5]     *Available at*: https://www.slideshare.net/guest558a6b/htc-global-services-us-dol-determination-letter

must submit, as part of the visa application, a certified Labor Condition Application ("LCA"), in which it must attest that "for the entire period of authorized employment, the required wage rate will be paid to the H-1B nonimmigrants." 20 C.F.R. § 655.731(a); *see* A.40-41 ¶ 23. LCAs are signed under penalty of perjury and are submitted to the Department of Labor for review and certification. *See id.*

An employer's certification that it will pay the required wage rate for H-1B workers is not a one-off representation, but a continuing obligation by the employer over the entire period of authorized employment in the U.S. The employer must maintain each certified LCA in its public access file and has an obligation—not only to maintain the accuracy of its certification—but to develop and maintain documentation sufficient to meet its burden of proving the validity of the wage statement contained in the LCA. 20 C.F.R. § 655.731(b)(1)-(3).

## II. HCL's Fraudulent and Unlawful Underpayment of H-1B Wages And Reduction Of Its Tax Obligation.

In order to reduce its costs of providing technology services in America, HCL has adopted a business model by which it mostly employs Indian citizens in the United States for whom it has secured a visa,

predominantly H-1Bs, as HCL is able to pay these employees significantly lower wages than American counterparts (known as "local hires"). A.39,47 ¶¶ 19, 54; *see* Ex. 2 to Fourth Am. Compl. ("FAC") at 3 (District Court Dkt. 48-2).

HCL is one of the highest volume recipients of H-1B visas in the United States, receiving thousands of visas every year. A.42,73 ¶¶ 26, 116.

For *each* H-1B visa, HCL makes an express certification that it will pay the H-1B worker the required wage rate (i.e., the *higher* of the actual or prevailing wage rate), even though it has no intention to do so. A.52 ¶ 65. HCL routinely pays H1-B workers much less than local hires who do not require a visa. *See* A.52-67 ¶¶ 65-67[6]; FAC Exs. 43 (at 9), 58 (at 669), 59 (at 245), 60 (at 972), 61 (at 325).[7] HCL has also "knowingly and repeatedly misrepresented the salary to be paid to its H-1B visa workers

---

[6] Portions of these allegations are redacted in the version of the FCA included in the appendix. The unredacted FAC is available to the Court at District Court Dkt. 49.

[7] Exs. 43, 58, 59, and 60 were filed under seal as attachments to the unredacted FAC at District Court Dkt. 49. Ex. 61 was filed at District Court Dkt. 48-61.

in order to avoid having these visa applications rejected." A.75-75 ¶ 118; *see* FAC Ex. 68 at 448.[8]

Most shockingly in terms of its systematic, fraudulent abuse of the H-1B visa program, HCL not only flouts clear legal wage requirements and its sworn LCA commitment to pay H-1B workers the required wage rate, but has also conducted detailed studies comparing by job type what it pays H-1B employees relative to non-visa employee local hires so that HCL can then secure H-1B visas for workers for the jobs that present the greatest cost savings to HCL if more underpaid H-1B employees are utilized in lieu of additional and more expensive local hires. A.53-56 ¶¶ 68-72.[9] Based on these findings, HCL has implemented company-wide guidelines to focus its H-1B visa nominations on a handful of skill areas and positions where the wage difference is the greatest between H-1B employees and local hires. A.53-56 ¶¶ 68-72 (citing and discussing Ex. 57

[8] Filed under seal as an attachment to the unredacted FAC at District Court Dkt. 49.

[9] Portions of these allegations are redacted in the version of the FCA included in the appendix. The unredacted FAC is available to the Court at District Court Dkt. 49.

at 1, 4, 10, 12, 13 and Ex. 39 at 3).[10]

HCL knows that that it underpays H-1B visa workers in violation of U.S. visa laws. A.56-57 ¶¶ 73-78.[11]

HCL's unlawful reduction of its obligation to pay H-1B wages and associated taxes deprived the government of tax revenue. A.72,80-81 ¶¶ 112, 126.

## III. HCL's Fraudulent Applications for L-1 and B-1 Visas for Work Requiring H-1B Visas.

Most of HCL's IT project work, if done by a foreign employee in the U.S., requires an H-1B visa. A.47-48 ¶ 55.

L-1 visas are intended for a substantially narrower range of work and workers than H-1B visas. A.43,64 ¶¶ 29, 95. For example, L-1A visas require that an actual job exist in which a prospective visa recipient primarily *supervises and controls* the work of others, as compared to

---

[10] An unredacted copy of these allegations is available to the Court at District Court Dkt. 49. Exs. 39 and 57 were filed under seal as attachments to District Court Dkt. 49.

[11] Portions of these allegations are redacted in the version of the FCA included in the appendix. The unredacted FAC is available to the Court at District Court Dkt. 49.

completing technical client project work. A.43,64 ¶¶ 29, 95 (citing 8 C.F.R. § 214.2(l)(1)(ii)(B)). L-1B visas are available only to individuals with highly specialized, *uncommon* knowledge within HCL, and the position for which the visa is sought must require such knowledge. A.43,64 ¶¶ 29, 95 (citing 8 C.F.R. § 214.2(l)(1)(ii)(D)).

The B-1 visa is a short-term visitor visa that allows a foreign national to temporarily enter the United States for limited business purposes, such as attending a business meeting or conference, negotiating a contract, or participating in short-term training. A.44 ¶ 32. B-1 visa holders may not perform skilled or unskilled labor while in the United States. A.44 (citing 8 U.S.C. § 1101(a)(15)(B)); 9 Dep't of State, Foreign Affairs Manual § 402.2-5(A) (May 13, 2019)). As such, B-1 visa holders are prohibited from performing *any* billable client work for their employer while in the U.S. A.44.

While the government caps the number of H-1B visas at 65,000 per year and awards H-1B visas through a competitive lottery process, A.42 ¶ 26, there is no cap or lottery process for L-1 or B-1 visas, which are available year-round, A.44 ¶¶ 31-32. There is also no wage requirement for L-1 or B-1 visas. A.44 ¶¶ 31-32.

Although L-1 and B-1 visas are not appropriate for most of HCL's U.S. positions, which would require H-1B visas, HCL nonetheless applies for L-1 visas for work requiring an H-1B visa and B-1 visas for work requiring an H-1B or L-1 visa. A.51,60,64-73 ¶¶ 64, 84-85, 95-97, 99-111, 113.[12] Once HCL brings the employees to the U.S. on an L-1 or B-1 visa, it then has them perform work requiring H-1B visa authorization. *Id.*

For example, HCL will use an L-1 visa to bring employees to the U.S. for a period of three years and then convert those workers to H-1B visas to extend their stay in the U.S., without any change in role. A.65 ¶ 97.[13] HCL will falsify workers' roles and qualifications on visa applications in order to obtain L-1 visas for employees who perform work for which an H-1B visa is required. A.60, 66-67 ¶¶ 84-85, 100.

HCL will routinely use B-1 visas to bring employees into the U.S. to perform billable, client project work for which an H-1B or L-1 visa is

---

[12] Portions of these allegations are redacted in the version of the FCA included in the appendix. The unredacted FAC is available to the Court at District Court Dkt. 49.

[13] Portions of these allegations are redacted in the version of the FCA included in the appendix. The unredacted FAC is available to the Court at District Court Dkt. 49.

required, particularly when it has urgent staffing needs and other "visa ready" offshore employees are not available, even though HCL knows that this practice is illegal. A.67-71 ¶¶ 101-03, 107-11.[14] When HCL applies for a B-1 visa, it falsely represents that the trip's purpose comports with the B-1 visa requirements. A.68-69 ¶ 103.

H-1B visa application fees ($2,460) are much higher than the application fees for L-1 ($1,460) or B-1 ($160) visas. A.42-45 ¶¶ 28, 31, 34. HCL is well aware of the cost savings of applying for those these cheaper visas in lieu of the more expensive H-1B visas. A.65 ¶ 98.[15]

HCL misuses L-1 and B-1 visas as cheaper substitutes for H-1B visas, without the hassle or delay of the H-1B visa lottery process, or to bring over foreign workers whose applications were not selected in the H-1B lottery. A.69 ¶¶ 104-105.

HCL is a high-volume recipient of L-1 visas. A.64 ¶ 95 (citing Ex.

_____

[14] Portions of these allegations are redacted in the version of the FCA included in the appendix. The unredacted FAC is available to the Court at District Court Dkt. 49.

[15] Portions of these allegations are redacted in the version of the FCA included in the appendix. The unredacted FAC is available to the Court at District Court Dkt. 49.

57 at 18) (*e.g.,* HCL obtained 1,974 L-1 visas between 2002 and 2011).[16] As a result of HCL's fraudulent applications for L-1 and B-1 visas, in lieu of H-1B visas, the government has lost significant revenue from visa application fees. A.72-73 ¶ 113.

HCL's conduct at issue in this case involved a complicated visa fraud scheme that has eluded law enforcement, even though the scheme has caused the government to lose significant revenues, in part because HCL is very secretive about its underpayment of H-1B visa employees and misuse of L-1 and B-1 visas. A.57,61-62,69-70 ¶¶ 77, 86-89, 106. As such, this is exactly the type of case where whistleblowers like Relators can advance the core purposes of the FCA.

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing Relators' two reverse-FCA claims. First, the district court dismissed the claim arising from HCL's fraudulent and unlawful underpayment of H-1B visa employee wages and associated taxes on the basis that HCL had no "obligation" to make

---

[16] *See* District Court Dkt. 48-57.

such payments. [17] HCL clearly had an "obligation" to pay H-1B visa employees "the required wage rate" pursuant to 20 C.F.R. § 655.731(a) and the associated taxes for same pursuant to 26 U.S.C. § 3111(a). *See* 31 U.S.C. 3729(b)(3) (defining obligation to include obligations arising from regulations and statutes). While the district court found that HCL could not have an "established duty . . . to pay federal payroll taxes on higher wages than [it] actually paid their employees," this ignored that HCL's fixed duty to pay the legally required wage amounts was not a "contingency," but rather, wrongdoing by HCL that had the "predictable consequence of depriving the government of money it was owed[.]" *U.S. ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.,* 336 F. Supp. 2d 430, 444 (E.D. Pa. 2004). Moreover, the district court incorrectly narrowed its analysis of HCL's false wage representations to those made in HCL's initial H-1B visa applications and overlooked altogether: (a) the ongoing nature of the false representations, and (b) that false representations are

_____

[17] The district court issued its decision without any oral argument, after HCL devoted only a single sentence to arguing that Relators' reverse-FCA claim based on HCL's wrongful decreasing of its obligation to pay H1-B wages and associated taxes for lack of an "obligation." *See* District Court Dkt. 53 at 20.

not required under the second prong of the reverse-FCA provision so long as HCL unlawfully reduces an obligation to pay wages and associated taxes. That the district court erred in its application of the reverse-FCA provision is perhaps most evident by the district court's failure to recognize that, in 2009, a second prong was added to the reverse-FCA provision under which a company can violate the provision without making a false representation to the government.

Second, the district court erred in dismissing Relators' reverse-FCA claim arising from HCL's fraudulent avoidance or decreasing of its obligation to seek and pay for H1-B visas for work that it knew required H-1B visas.

Two cases—*ConAgra* and *Franchitti*—demonstrate that HCL had an obligation to seek H-1B visas, and to pay the application fees for those visas, when it was seeking to utilize foreign labor that required an H-1B visa. *ConAgra* presented the same issue and involved materially similar facts. *See infra* pp. 45-50 (discussing *United States ex rel. Bahrani v. ConAgra, Inc.*, 465 F.3d 1189 (10th Cir. 2006)). Just as ConAgra had a duty to obtain replacement meat export certificates, and to pay the fee required for the same, HCL had a duty to seek H-1B visas and to pay the

fee for the same. *Franchitti* recently addressed the same issue presented here in the context of virtually identical reverse-FCA claims. The court denied, in relevant part, the defendant's motion to dismiss, finding that "[b]y paying for L-1 and B-1 visas but directing its employees to perform work that required the more expensive H-1B visa, Cognizant decreased – and made false statements material to – its obligation to pay money to the government under 31 U.S.C. § 3729(a)(1)(G)." *Franchitti v. Cognizant Tech. Sol. Corp.,* 555 F. Supp. 63, 71 (D.N.J. Aug. 17, 2021).

Like with Relators' reverse FCA-claim based on underpayment of H-1B wages and associated taxes, the district court overlooked that HCL can be held liable under the second prong of the 2009-amended reverse-FCA provision "by directing its employees to perform work that required the more expensive H-1B visa" when it had only obtained and paid for L-1 or B-1 visas for those employees. *See* District Court Dkt. 57 (citing *Franchitti*, 555 F. Supp. at 71).

The district court departed from the approach and reasoning of these cases primarily based on *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923 (N.D. Cal. 2019). *See* A.28 (citing *Lesnik*). But the district court's heavy reliance on *Lesnik* was misplaced because *Lesnik* was primarily

based on (a) an overly restrictive and now-abrogated interpretation of "obligation" from *ATMI* and (b) concessions by the plaintiff's attorney binding only in that case. 374 F. Supp. 3d at 940; *see United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 252, 255 (3d Cir. 2016) (reversing district court's denial of reverse-FCA for lack of an "obligation" and explaining that the district court "followed the reasoning in *ATMI*, but . . . that reasoning has been called into doubt, if not entirely abrogated, by the FERA.").

## ARGUMENT

### I.  Standard of Review.

This Court reviews questions of law de novo, *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 83 (2d Cir. 2020), and "review[s] a district court's grant of a motion to dismiss the complaint on the pleadings de novo [too,] 'constru[ing] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor,'" *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

## II.    **The False Claims Act Framework.**

Enacted in 1863, the FCA has undergone a number of amendments and changes. *See, e.g.*, David J. Ryan, *The False Claims Act: An Old Weapon with New Firepower*, 4 Annals Health L. 127, 128 (1995). An overview of the law's most recent amendments—the introduction of the reverse-FCA provision in 1986 and amendments in 2009 to add a definition of "obligation" and to add a second prong that eliminates the false statement requirement—helps elucidate the district court's error in applying the FCA's reverse false claims provision to HCL's fraudulent scheme. Specifically, the district court erred by applying an overly narrow interpretation of "obligation," by ignoring the second prong of the reverse FCA-provision, and by relying on cases decided pursuant to case law that was explicitly abrogated by Congress.

### A.    **1986 Amendment to the FCA.**

In 1986, Congress amended the FCA and explicitly "attempted to encourage qui tam actions while avoiding the problem of rewarding opportunists." *Id.* at 129. "The amendments reduced the plaintiff's burden of proof, lowered standards for showing intent and knowledge and significantly raised penalties and damages." *Id.* Lengthy debates reveal

congressional impatience over what was perceived as rampant fraud and governmental acquiescence. *See* S. Rep. No. 99-345, at 2-3 (1986) (reprinted in 1986 U.S.C.C.A.C. 5266, 5267-68). Congress was also concerned about a number of judicial rulings that it believed had hindered enforcement of the statute. *See id.* As a result, the 1986 amendments presented major changes "to strengthen and clarify the Government's ability to detect and prosecute civil fraud and to recoup damages suffered by the Government as a result of such fraud." H.R. Rep. No. 99-660, at 16 (1986).

The 1986 amendments introduced the "reverse false claims provision." *ConAgra*, 465 F.3d at 1194.[18] This provision imposed liability whenever a person "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an *obligation* to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (1986) (emphasis added). The provision "was added 'to provide that an individual who makes a material misrepresentation to avoid

_____

[18] This subsection of the FCA "is described as a 'reverse false claims' provision because the financial obligation that is the subject of the fraud flows in the opposite of the usual direction." *Id.* at 1195.

paying money owed to the Government would be equally liable under the Act as if he had submitted a false claim to receive money.'" *ConAgra*, 465 F.3d at 1194 (quoting S. Rep. No. 99-345, at 18 (1986)).

## B. Judicial Reaction to the 1986 Amendments.

The 1986 version of the reverse-FCA provision did not define "obligation," and as a result, courts disagreed about the scope and nature of "obligations" that could give rise to reverse-FCA liability.

The Department of Justice ("DOJ") appeared in many of these cases, as either a party or *amicus*, and urged courts to adopt a broader interpretation of "obligation." The DOJ took the position that an obligation may arise in either of two ways. *United States v. Bourseau*, Appellee Br., 2007 WL 1577381, at 10 (hereinafter "DOJ *Bourseau* Br.").

First, an obligation may be "fixed" by an instrument such as a judgment, contract, statute, or regulation that imposes a duty to pay money or transmit property to the government. *Id.* A fixed obligation may be liquidated, as with a judgment, or unliquidated, as with tariffs on imported goods. *Id.*

Second, an "obligation" "may also arise by virtue of the relationship between the government and the person who owes the government

money or property." *Id.* [19] Specifically, "[w]hen the person and the government have a contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship, a duty to pay or to transmit property to the government is an actionable obligation under § 3729(a)(7)." *Id.* In the DOJ's view, "[t]hese relationships, involving payment of money or property by a person to the United States . . . are at the core of the concerns Congress has had in shaping the FCA." *Id.*[20]

Courts split on whether to interpret "obligation" narrowly, as limited to "fixed" obligations, or to adopt the broader interpretation of "obligation" as encompassing both categories urged by the DOJ.

The two leading cases that interpreted "obligation" narrowly, and which Congress later abrogated in 2009, were *American Textile*

---

[19] This category served to broaden the meaning of the term "obligation," but still excluded potential penalties or fines. *Id.*, at 11.

[20] The DOJ took a similar position as *amicus* in *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 656 (5th Cir. 2004) (stating that the United States as *amicus* urged the court to recognize that reverse-FCA liability could be based on (1) not just fixed obligations, but also (2) obligations arising from an "economic or financial relationship" with the government where the government provides some benefit to the defendant in exchange for an expected payment or transfer of property).

*Manufacturers Institute, Inc. v. Limited, Inc.* ("*ATMI*"), 190 F.3d 729 (6th Cir. 1999) and *United States v. Q International Courier* ("*Quick*"), 131 F.3d 770 (8th Cir. 1997).

In *ATMI*, defendant clothing importers allegedly imported apparel produced in China but falsely claimed that it was produced in Hong Kong or Macau to avoid import duties and restrictions. 190 F.3d at 731. *ATMI* claimed that the defendant had used false statements to "avoid" or "conceal" liability to the government for various fines, penalties, and duties and sought a reverse-FCA recovery. *Id.* at 731-32. The DOJ appeared, as *amicus*, and urged the court to affirm the dismissal of this claim, but to "hold that the district court adopted an overly-restrictive interpretation of the statute." *Id.* at 740. The DOJ asked the court to hold that the reverse-FCA provision "'encompasses within its scope those obligations owed to the government (under statute, regulation, contract, or quasi contract) arising from the provision of some privilege, right or benefit in return for which the recipient owes money or property,'" *id.*, a position that was essentially adopted in the 2009 amendments, as discussed below.

The Sixth Circuit observed that it would "leave for a more

appropriate case the status of those obligations arising from the provision of 'rights, privileges, or benefits,' and those obligations created by statute or regulation that are 'essentially contractual in nature.'" *Id.* at 741. But in a finding Congress later identified as one the reasons for the 2009 amendments,[21] the court narrowly interpreted the reverse-FCA provision as requiring proof that the "defendant made a false record or statement at a time that the defendant owed to the government an obligation *sufficiently certain to give rise to an action of debt at common law.*" *Id.* at 736 (emphasis added).

Similarly, in *Quick*, the U.S. Postal Service ("USPS") sued a mail courier firm ("Quick") that used a scheme to exploit a differential between U.S. domestic postage rates and lower postage rates in Barbados for international mail to the U.S. (10x cheaper). 131 F.3d at 772.[22] Quick shipped mail in bulk to Barbados for delivery to destinations in the United States. *Id.*

---

[21] S. Rep. No. 111-10, at 14 n.10 (2009).

[22] For these letters, Quick paid only the Barbados international postal rate. *Id.* at 772.

The government claimed, citing "various statutes and regulations," that Quick had an "obligation" to the government to pay "full domestic postage" but had "reduce[d] this obligation through fraudulent statements or records," *Id.* at 772-73. The Eighth Circuit agreed that an "obligation" could arise from statutes or regulations that require a payment,[23] but affirmed summary judgment because the specific statutes and regulations the government had identified "do not create a legal duty for the defendants to pay domestic postage." *Quick*, 131 F.3d at 773.[24] The *Quick* court interpreted "obligation" narrowly, stating that it "must be for a fixed sum that is immediately due." *Id.* This narrow interpretation was one reason for Congress' 2009 amendments. Letter

---

[23] In *United States v. Raymond & Whitcomb Co.,* a district court in this Circuit relied on and applied this acknowledgment from *Quick* in declining to dismiss a reverse-FCA claim that was "essentially identical," but found that the language of the regulations on use of non-profit mail demonstrated a "clear actual obligation." 53 F. Supp. 2d 436, 445 (S.D.N.Y. 1999).

[24] While the *Quick* court initially couched its holding "in temporal terms…[its] discussion makes clear that the emphasis is not so much on the *timing* of the obligation as on its *source*." *U.S. ex rel. Huangyan Imp. & Exp. Corp v. Nature's Farm Prods.*, 370 F. Supp. 2d 993, 999-1000 (N.D. Cal. 2005).

from M. Faith Burton, Acting Ass't Att'y Gen., Dep't of Justice, to The Hon. Patrick J. Leahy, Chairman, Comm. on the Judiciary, app. at 3. (Apr. 01, 2009) [25] [hereinafter, "April 1, 2009 DOJ Letter"].

By contrast, the Eleventh, Tenth, and Ninth Circuits adopted the DOJ's broader interpretation of "obligation" in *Pemco*, *ConAgra*, and *Borseau. See United States v. Pemco Aeroplex*, 195 F.3d 1234, 1237 (11th Cir. 1999);[26] *ConAgra*, 465 F.3d at 1192, 1200-1202;[27] *United States v. Bourseau,* 531 F.3d 1159, 1170 (9th Cir. 2008).

## C. 2009 FERA Amendments to Expand Scope of Reverse-FCA Liability Through § 3729(a)(1)(G) and "Obligations" Giving Rise to Liability Thereunder.

In response to courts' unduly narrow interpretation of the FCA, including the term "obligation," Congress began working on legislation in 2008 to "correct erroneous court interpretations that have limited the scope and application of the FCA in contravention of Congress's intent in

---

[25] *Available at*:
https://www.justice.gov/sites/default/files/ola/legacy/2009/06/03/040109-s386-fraud-enforcement-recovery-act.pdf.

[26] *See infra* at 59-61.

[27] *See infra* at 45-50.

passing the 1986 Amendments," specifically including *ATMI*, because "[t]he need for a robust FCA cannot be understated." S. Rep. No. 110-507.

In 2009, Congress continued this work and passed the Fraud Enforcement and Recovery Act of 2009 ("FERA"), which made "two substantial changes" to the reverse-FCA provision. *Victaulic*, 839 F.3d at 252. First, Congress modified the reverse-FCA provision by adding a second prong whereby a defendant can be liable for wrongfully avoiding or decreasing an obligation to pay the government *without making or using a false statement*:

| 31 U.S.C. § 3729(a)(7) (2008) | 31 U.S.C. § 3729(a)(1)(G) (2009) |
|---|---|
| ". . .knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. . ." | ". . .knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government*. . ." |

*See U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017) (noting that "Congress added a second route to liability" which "expands" on the first by "not requiring a 'false record or

statement'"); *see also United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1055-57 & n.408 (N.D. Cal. 2020) (discussing "two prongs" of 3739(a)(1)(G) and noting "[t]here is no requirement under the second prong to show that the defendant used a false record or statement or that a record or statement was material"); *see also Victaulic,* 839 F.3d at 255 (noting that FERA amended the FCA such that "[a] false statement is no longer a required element").

Second, Congress defined the term "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

Congress essentially codified the interpretation of "obligation" that the DOJ had been urging courts to adopt. *See supra* § II(B)-(C). The purpose of doing so was "to correct those cases [such as *ATMI* and *Quick*] that unduly narrowed the reverse false claim provision by holding or suggesting that the term 'obligation' encompasses only a duty to pay that is fixed in all particulars, including the specific amount owed." April 1, 2009 DOJ Letter at app. 3 (citing *ATMI*, 190 F.3d 729; *Quick*, 131 F.3d

770). The Senate Judiciary Committee indicated that it was adding this definition of "obligation" to "address[] current confusion among courts that have developed conflicting definitions of the term 'obligation' in Section 3729(a)(7)" and to clarify its "view, held since the passage of the 1986 Amendments, that an 'obligation' arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not the amount owed is yet fixed.'" S. Rep. No. 111-10 (2009).

In its report, the Senate Judiciary Committee expressly "endorsed" the Tenth's Circuit's decision in *ConAgra* "for its interpretation of an FCA 'obligation,'" *U.S. ex. rel. Kane v. Healthfirst, Inc.,* 120 F. Supp. 3d 370, 388 (S.D.N.Y. 2015) (citing S. Rep. No. 111-10, at 14 & n.14 (2009)), as well as the Eleventh Circuit's decision in *Pemco*.[28]

The Committee also stated that *ATMI* was one of the "incorrectly

---

[28] The Committee also cited with approval the DOJ's appellee brief in Borseau ("DOJ *Bourseau* Br."), discussed *supra* § II(B). *See* S. Rep. No. 111-10 at 14 & n.14 (2009).

decided" cases it was abrogating through its definition of the term "obligation." *Victaulic,* 839 F.3d at 253-55 ("In effect, the FERA expressly rejected *ATMI*'s narrow interpretation of the FCA's reverse false claims provision in favor of a more broadly inclusive definition. . . . *ATMI's* . . . reasoning has been called into doubt, if not entirely abrogated, by the FERA."); S. Rep. No. 111-10, at 14 & n.9 (2009).

Collectively, these two statutory changes "broadened the scope to which reverse false claims liability would attach." *Id.* at 252.

## III. Relators Sufficiently Pled that HCL Knowingly Avoided or Decreased an "Obligation" to Pay the Government Money.

The reverse-FCA provision creates liability when a person or entity (1) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government;" or (2) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G)); *see Ormsby*, 444 F. Supp. 3d at 1055-56 (describing the two distinct "prongs" of § 3729(a)(1)(G) liability). The elements required to plead a reverse-FCA claim vary slightly by prong. *Ormsby*, 444 F. Supp. 3d at 1055-56.

For a reverse-FCA claim under the first prong, the elements are: (1) a record or statement was false, (2) the defendant had knowledge of the falsity, (3) the defendant made or used (or caused to be made or used) the false record or statement, (4) the defendant's purpose was to conceal, avoid, or decrease an "obligation" to pay the government, and (5) the false record or statement was material. *Id.*

Under the second prong, a relator need only show that defendant (1) concealed or improperly avoided or decreased an obligation to pay the government and (2) did so knowingly. *Id.* at 1056 (citing *Victaulic*, 839 F.3d at 255); *see also United States v. Walgreen Co.*, 591 F. Supp. 3d 297, 303-04 (E.D. Tenn. 2022) (citing *U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 433 (6th Cir. 2016)). There is no requirement that the defendant make or use a false statement or record under the second prong. *Barrick,* 878 F.3d at 1230; *Ormsby*, 444 F. Supp. 3d at 1056, n. 408; *Victaulic*, 839 F.3d at 255.

In stating the elements for a reverse-FCA claim, the district court erroneously stated that to bring any reverse-FCA claim, relators "must allege" a "false record or statement," A.21, contrary to the second prong of § 3729(a)(1)(G), *Barrick,* 878 F.3d at 1230. Specifically, the district

court held that Relators must allege "'(1) the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government – a duty to pay money or property.'" A.21 (quoting *Yu,* 2021 WL 5827047, at *12).[29]

Here, Relators pled reverse-FCA claims based on: (A) HCL unlawfully underpaying H-1B visa employees and thereby wrongfully decreasing an obligation to pay the government associated taxes; and (B) HCL wrongfully avoiding or decreasing an obligation to seek H-1B visas, and to pay the application fees required for same, by fraudulently applying for cheaper L-1 and B-1 visas, and then unlawfully instructing employees to perform work requiring H-1B visa authorization without having obtained such visas.

The district court dismissed Relators' reverse-FCA claims because it found that there was no "obligation" to pay the government in either

---

[29] In *Yu*, dismissal was warranted under either prong because the defendant's misconduct was not material to the government's decision to make payments, which continued even after defendant's conduct was made public. *Id*. at *9.

instance. A.19-32.[30] This Court should reverse the dismissal of Relators' claims because this was error.

## A. Relators Adequately Allege That HCL Knowingly and Improperly Decreased its Obligation to Pay H-1B Wages and Taxes.

The district court erred in dismissing Relators' reverse-FCA claim relating to HCL's underpayment of H-1B visa workers because HCL wrongfully decreased an "obligation" to pay the government through this conduct.

An "obligation" is "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Congress crafted this broad definition of "obligation"

---

[30] The district court did not reach or address any of HCL's other arguments for dismissal. *See* A.32 ("[T]he Court does not reach defendants' remaining arguments in support of dismissal, including those implicating the Tax Bar and the public disclosure bar."); *see Goldberg v. Danaher,* 599 F.3d 181, 184 (2d Cir. 2010) ("We have considered the parties' remaining arguments on appeal but decline to resolve them here, preferring that the district court make a determination in the first instance.").

to ensure that the government could recover financial losses suffered from a broad range of circumstances where a defendant avoids or decreases an obligation to pay money to the government, while also preventing the FCA from encompassing liability for contingent penalties. *See supra* § II(B)-(C).

An "obligation" to pay money to the government can arise from a variety of sources or circumstances, but clearly exists where a duty to pay arises from a regulation or contract, or where a relationship with the government results in a duty to pay the government, whether or not the amount is yet fixed. 31 U.S.C. § 3729(b)(3); *see Victaulic*, 839 F.3d at 253; *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 WL 6908856, at *16 (S.D. Ga. Dec. 8, 2014) ("[T]he FCA does not necessarily require that an obligation arise in a certain manner. . . . '[Q]uasi-contractual obligations created by statute or regulation' do suffice and are thus distinguishable from '[c]ontingent obligations – those that will arise only after the exercise of discretion by government actors – [w]hich are not contemplated by the statute.'" (quoting *ATMI.*, 190 F.3d at 738)).

Here, there is no question that HCL had an "obligation" to pay H-1B visa employees the *higher* of (1) the same wage amounts it pays non-

visa-dependent employees; or (2) the prevailing wage. First, 20 C.F.R. § 655.731(a) expressly requires this. *See* 31 U.S.C. 3729(b)(3) (regulatory duty demonstrates the existence of an obligation); *see also, e.g., Schaengold,* 2014 WL 6908856, at *16 (express statutory requirement to pay is sufficient to demonstrate existence of an obligation). Second, HCL certified to the government that it would pay H1-B visa employees "the required wage rate" "for the entire period of authorized employment." *See* 20 C.F.R. § 655.731(a); 31 U.S.C. § 3729(b)(3) (implied or express contract demonstrates the existence of an obligation); *see also, e.g., Pemco,* 195 F.3d at 1237. The duty to pay the required amount of H1-B wages is in no way contingent upon the discretion of a governmental agency or actor like a statutory fine. *Cf. Schaengold,* 2014 WL 6908856, at *16.

It is also clear that HCL's obligation to pay H1-B visa workers the required wage amount simultaneously constituted an obligation to pay the government associated taxes. *See* 26 U.S.C. § 3111(a); *see also, e.g.,* Dep't of Treasury, IRS, Pub. 15 (Circular E), Employer's Tax Guide (2021) (setting forth 2021 employer contributions for Social Security (6.2%) and Medicare (1.45%)); HTC Global Services, Inc., No. 1507879 (Dep't of Labor June 9, 2009) (ALJ determination letter), *supra* n. 5.

For its H-1B workers, HCL had a clear legal obligation to pay the wage amounts required by 20 C.F.R. § 655.731 and to pay the taxes on those wages required by 26 U.S.C. § 3111(a). These obligations existed "for the entire period of authorized employment" in the U.S., 20 C.F.R. § 655.731(a), including every pay period when HCL wrongfully decreased its obligation to pay both H1-B visa employees and the government.

Like the defendants in *Franchitti*, HCL did not develop any meaningful argument disputing that these "obligations" are actionable under the reverse-FCA provision. In *Franchitti*, a relator brought reverse-FCA claims against one of HCL's competitors for the same two categories of misconduct at issue in this case, including "underpayment of its H-1B visa workers [which] deprived the United States of significant tax revenue by reducing the required amount of its payroll tax contributions." 555 F. Supp. 3d at 67. While Cognizant disputed that it had an "obligation" to obtain H-1B visas and pay H-1B visa fees, it did not challenge that it had an "obligation" to pay minimum H-1B wages and associated taxes. *Id.* at 69-71; *see also id.* at 74 (denying motion to dismiss claim for underpayment of taxes for underpaid H-1B workers). Here, HCL challenged that its "obligation" to pay H-1B employee wages

and taxes was actionable under the reverse-FCA provision in only a perfunctory manner. *See* District Court Dkt. 53 at 20 (devoting only a single sentence to this argument); *compare* District Court Dkt. 57 at 11 ("HCL presents no coherent argument to show that its obligation to pay H-1 visa holders the legally required wage, and to pay the U.S. government the corresponding payroll taxes does not constitute an obligation under the amended FCA."), *with* District Court Dkt. 63 (not addressing Relators' responses in its reply).

HCL's single-sentence argument in its motion to dismiss was vague and clearly lacked merit. HCL stated: "[s]imilarly, any claimed underpayment of taxes is based on some speculative amount of taxes owed that were never actually assessed or contingent upon approval of visas that HCL never actually received." District Court Dkt. 53 at 20. But payroll taxes are not "assessed" like a penalty or a fine contingent on discretionary enforcement; they are automatically and contemporaneously due based on an easily determinable statutory formula that is directly proportionate to the amount of wages paid. *See* 26 U.S.C. § 3111(a); *see also, e.g.*, Dep't of Treasury, IRS, Pub. 15 (Circular E), Employer's Tax Guide (2021) (setting forth 2021 employer

contributions for Social Security (6.2%) and Medicare (1.45%)). As such, by unlawfully underpaying H-1B wages, HCL wrongfully reduced its obligation to pay payroll taxes to the government. *See* A.72 ¶ 112.

Even though HCL did not ultimately receive every H-1B visa for which it applied, it nonetheless received thousands of H-1B visas every year, and wrongfully underpaid wages and associated taxes it owed as a requirement for the visa authorization to employ those workers. A.73 ¶ 116. HCL's statement that its obligation to pay the required wages for H-1B workers was "contingent upon approval of visas that HCL never actually received," District Court Dkt. 53 at 20, ignores that Relators seek underpaid taxes only for those employees for whom HCL successfully secured H-1B visas, and incorrectly assumes that the only point in time when it might have incurred reverse-FCA liability was when it first fraudulently certified in its initial H-1B visa applications that it would pay the required wages.

Moreover, HCL ignores that its underpayment of H-1B wages and taxes *itself* give rise to reverse-FCA liability. *Ormsby*, 444 F. Supp. 3d at 1056. Since reverse-FCA liability need not be based on a false statement, HCL's liability is not limited to those points in time when HCL made or

used false statements. *Id.* at 1056 n.408; *Barrick*, 878 F.3d at 1230; *Victaulic*, 839 F.3d at 255. At the time that HCL was unlawfully underpaying H-1B visa employee wages and associated taxes, the government had clearly already approved the H-1B visas in question.

Even if reverse-FCA liability had to be premised on a false statement (which is no longer true), HCL nonetheless made or used a false record material to an obligation to pay "at the time" it underpaid H-1B wages and taxes. Although HCL *first* fraudulently represented that it would pay H-1B visa holders the legally-required amounts in its LCA form, its fraudulent certification in that form must be considered ongoing—or, at the very least, HCL continued to "use" that false record— because the LCA forms must remain on file, the required wage must be paid for an employee's entire time in the U.S., and HCL has an affirmative and ongoing obligation to ensure that its LCA wage certification remains accurate and is supported by documentation.[31]

---

[31] An employer is also legally required to submit a new LCA form for any H-1B visa amendments or extensions. *See* USCIS, "USCIS Draft Guidance on When to File an Amended H-1B Petition after the Simeio Solutions Decision," 5/21/2015, *available at:*

A.40-41 ¶ 23 (District Court Dkt. 48); 20 C.F.R. § 655.705(c)(1)(5); 20 C.F.R. § 655.731(b); *see Pemco*, 195 F.3d at 1237 ("This legal obligation was a specific, ongoing obligation during the life of the contract and did not begin or end at any one point in time.").

HCL failed to develop—and thus waived—any other argument that it had no "obligation" to pay H-1B wages and associated taxes. *See, e.g.*, *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.,* 865 F.3d 71, 79 (2d Cir. 2017) (holding defendant-appellee "forfeited the public disclosure defense by failing to raise the argument in the district court.").

The district court provided two reasons for finding no "obligation" to pay the government in connection with this claim, A.29, both of which misapprehended applicable law or key facts.

_____

*https://www.uscis.gov/archive/uscis-draft-guidance-on-when-to-file-an-amended-h-1b-petition-after-the-simeio-solutions-decision.* Here, HCL would have had to file amended H-1B petitions in many instances because it often applied for large volumes of H-1B visas based on fictitious jobs to create a pool of "visa ready" employees to fill future positions, and H-1B visa amendments were required to identify actual positions (and geographic locations) to which H-1B employees were staffed. *See* A.42,48-51,58-63 ¶¶ 27, 58-63, 79-92.

The district court first reasoned that HCL could not have an "established duty . . . to pay federal payroll taxes on higher wages than [it] actually paid their employees." A.29 (citing 26 U.S.C. § 3111(a)); *see also* A.31 ("only if defendants had paid higher wages, would there have been an obligation to pay the higher visa fees or taxes."). This ignores that HCL had an established regulatory duty to pay the higher, required wages. 20 C.F.R. § 655.731. As such, HCL's failure to pay the fixed and legally required wage amounts was not a "contingency" that would remove the obligation to pay from the ambit of the reverse-FCA statute, but rather, a deliberate choice by HCL that had the "predictable consequence of depriving the government of money it was owed." *Merck-Medco Managed Care.,* 336 F. Supp. 2d at 444.

Second, the district court here reasoned that "*at the time* of the alleged misconduct, [HCL] did not have an established obligation to pay higher payroll taxes because [HCL] w[as] not paying any wages that supported such taxes." A.29. The district court appears to have incorrectly evaluated Relators' reverse-FCA claim only from the period of time when HCL first applied for H-1B visas, and overlooked the various other points in time when HCL wrongfully reduced its obligation to pay

H-1B wages and associated taxes. *See supra* pp. 37-40. Because HCL's primary "misconduct" was the underpayment of H1-B visa employees' wages and corresponding payroll taxes *itself*, this misconduct clearly occurred "at the time" when HCL had a duty to pay. In any event, whether a duty is established "at the time" of the misconduct in question "is not so much [about] the *timing* of the obligation as [] its *source*." U.S. ex rel. *Hyuangyan Imp & Exp. Corp v. Nature's Farm Prods.*, 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005) (emphasis in original). A duty to pay is "established" where, like in the instant case, a regulatory scheme establishes a duty to pay *independent* of some wrongdoing by the defendant. *Id.* Here, HCL's duty to pay H-1B wages and associated taxes was an established duty—required by applicable law of HCL as an employer of H-1B employees—not a contingent penalty or fine that accrued only by function of wrongdoing by HCL.

While the district court relied principally on *Lesnik* to find that Relators had failed to allege an "obligation" with respect to their reverse-FCA claim based on visa application fees, *see* A.21-28, *Lesnik* did not address whether underpayment of H-1B wages and associated taxes constituted the decreasing of an "obligation" under the FCA, *see generally*

374 F. Supp. 3d 923. And the *Lesnik* decision was flawed and distinguishable because it relied on the abrogated interpretation of "obligation" from *ATMI*, and on concessions made in that case not applicable here, as further discussed in Section III(B), *infra. See Lesnik*, 374 F. Supp. 3d at 940.

### B. Relators Adequately Allege That HCL Knowingly and Improperly Avoided and/or Decreased its Obligation to Pay H1-B Visa Application Fees.

The district court also erred in dismissing Relators' reverse-FCA claim for financial losses suffered by the United States government due to HCL's improper avoidance or decreasing of its obligation to pay the H-1B visa application fees for work they knew required an H-1B visa (prong two of § 3729(a)(1)(G)), and also for HCL fraudulently applying for cheaper L-1 and B-1 visas—and fraudulently describing the nature of the work for which they were seeking visa authorization—because this fraud was material to HCL's obligation to pay the appropriate visa application fee to the U.S. Government (prong one of § 3729(a)(1)(G)). *See Franchitti*, 555 F. Supp. 3d at 69-71 (denying motion to dismiss nearly identical claim).

HCL's failure to seek H-1B visas—and to pay the required H1-B visa application fees—for work that it *knew* required H1-B visas is actionable under the reverse-FCA provision. HCL knowingly decreased or concealed its obligation to pay higher H1-B visa application fees by fraudulently obtaining cheaper L-1 or B-1 visas based on false statements about the nature of the work for which it was seeking visa authorization. The critical issue is whether HCL had an "obligation" to seek H1-B visas and to pay the higher H-1B visa application fees when it was applying for visas for work that it knew required an H1-B visa (but for which an L-1 or B-1 visa was inappropriately sought), or at least before instructing foreign employees to perform work in the U.S. that it knew required an H-1B visa. *See* A.19-28.

An "obligation" can arise from "a relationship between the Government and a person that *results* in the duty to pay the government money, whether or not the amount owed is yet fixed." *Victaulic*, 839 F.3d at 253. A defendant has an "obligation"—for purposes of reverse-FCA liability—when it will have a duty to pay money "from a fee-based relationship or similar relationship" or "from statute or regulation." 31 U.S.C. § 3729.

Two cases—*ConAgra* and *Franchitti*—demonstrate that HCL had an "obligation" to seek H1-B visas, and to pay the visa application fees required for the same, when it was applying for visas for work that it knew required an H1-B visa and when it was directing employees for whom it had inappropriately obtained L-1 or B-1 visas to perform work that it knew required an H-1B visa.

In *ConAgra*, the relator claimed that a defendant was altering existing USDA export certificates—instead of obtaining replacement certificates and paying the fee required for those certificates—in order to "conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 465 F.3d at 1192. The pivotal issue was essentially the same as is presented here: whether the defendant had an "obligation" to "obtain replacement certificates and pay the accompanying fee." *Id.*

As a meat exporter, the defendant operated under a comprehensive regulatory scheme, which included a requirement that the defendant have an export certificate. *Id.* at 1193. If the export certificate contained a significant error or omission, the defendant was required to obtain a replacement certificate and to pay the accompanying fee for that

certificate. *Id.* at 1192-93, 1198. The relator claimed that the defendant "routinely altered the original certificates or forged new certificates . . . rather than obtaining . . . replacement certificates." *Id.* at 1194. By doing so, defendant "avoided the fees that the company would have been required to pay for new certificates." *Id.* Like in this case, the district court dismissed the relator's claim because it found that the relator had "not established that the [defendant] was obligated to pay for . . . replacement certificates." *Id.* at 1197. The district court also found that any such obligation was "contingent"—and thus, not covered by the reverse-FCA provision—because USDA inspectors "could exercise their discretion not to require . . . replacement certificates" and in in such instances, no fee would be charged. *Id.*

On appeal, the DOJ appeared as *amicus* and urged the court to adopt a definition of "obligation" virtually identical to the definition later codified in § 3729(b)(3). *Compare id.* at 1201, *with* 31 U.S.C. § 3729(b)(3); *see supra* § II(B)-(C). The DOJ also argued that the regulatory requirement that defendant obtain replacement certificates, and pay the fees for same, "fall[s] within [this definition of] obligations." *Id.* The Tenth Circuit agreed, and found that by virtue of its relationship with the

government and the regulatory scheme, the defendant had an "obligation" to obtain a replacement certificate, and to pay the fee for the certificate, when it discovered a significant error or omission with the original certificate that necessitated a replacement. *Id.* at 1202.

As in *ConAgra*, when HCL had an obligation to seek an H1-B visa and to pay the corresponding application fee for that visa when it was applying for visas for work requiring an H1-B visa, or at least before instructing workers to perform work that it knew required an H-1B visa. *See id.* at 1202. While ConAgra fraudulently avoided an obligation to pay the government fees for replacement export certificates by altering original export certificates, HCL wrongfully avoided or decreased its obligation to seek H-1B visas, and to pay the government the application fees required for same, by fraudulently applying for cheaper L-1 or B-1 visas and falsifying the nature of the work for which it was seeking visa authorization and by instructing workers to perform work that it knew required an H-1B visa, when HCL had not sought or paid for an H-1B visa.

HCL argued that its obligation to pay H-1B visa application fees was only a "potential" or "contingent" obligation—and therefore not

actionable under 3729(a)(1)(G)—because there is a competitive lottery process for H-1B visas, which means that it may not ever have been charged the H-1B visa application fee if it applied for the correct visa. District Court Dkt. 53 at 17. ConAgra similarly argued that its obligation to pay for replacement certificates was "contingent"—like unassessed fines and penalties in *ATMI* and *Quick*—because there were a couple "additional stages" of the process before that fee became due, and the fee may never have become due, as USDA officials can exercise their discretion not to require a replacement certificate and therefore, not to charge a fee at all. *ConAgra*, 465 F.3d at 1197, 1201, 1203.

The court rejected this argument and distinguished the fee for a replacement export certificate from a contingent penalty for two reasons. First, the purpose of the cost of a replacement export certificate was akin to a "user fee" and was "not a penalty." *Id.* at 1203. [32] Second, the obligation to obtain and pay for a replacement certificate arose *independently*—and existed *at the time*—that the defendant avoided that

---

[32] The relator was not alleging that ConAgra incurred a fine or penalty by falsifying the certificates like in *ATMI*. *Id.*

obligation by altering the original certificate. *Id.* at 1202. In contrast to a "contingent penalty," ConAgra's obligation to obtain and to pay for a replacement certificate arose from having discovered a significant error or omission with the original certificate. *Id.* The court also explained that the possibility a fee might not have ultimately been charged in a counter-factual scenario where the defendant had sought a replacement certificate, without the USDA charging a fee, "does not mean that the 'obligation' is a contingent one outside the scope of § 3729(a)(7)" as "the need for some further governmental action or some further process to liquidate an obligation does not preclude a false claims action." *Id.* at 1204 (quoting the *amicus* brief submitted by the DOJ in that case).

Here, like in *ConAgra*, HCL's obligation to seek H-1B visas, and to pay the application fees for same, existed by virtue of HCL seeking to have—or having—foreign employees perform work in the U.S. requiring H-1B visa authorization. *See ConAgra*, 465 F.3d at 1202-1203; *Franchitti*, 555 F. Supp. at 71. As such, HCL's obligation existed *independently of* and *prior to* HCL fraudulently applying for cheaper L-1 and/or B-1 visas for labor that it knew required an H-1B visa and to HCL wrongfully utilizing employees to perform work requiring H-1B visas without having

sought or paid for H-1B visas. *See ConAgra*, 465 F.3d at 1202-1203; *Franchitti,* 555 F. Supp. at 71.

While *ConAgra* pre-dated the 2009 amendment to the reverse-FCA provision, Congress "endorsed" and approved of *ConAgra* "for its interpretation of an FCA 'obligation,'" *Kane*, 120 F. Supp. 3d at 388 (citing S. Rep. No. 111-10, at 14 & n. 14 (2009)) and codified a definition of "obligation" that tracked its holding. *See supra* § II(C). As such, *ConAgra* should be considered even more persuasive than when it was decided.

The *Franchitti* court recently addressed the same issue in the context of nearly identical reverse-FCA claims[33] against one of HCL's competitors, Cognizant. 555 F. Supp. 3d at 69-71. The relator in *Franchitti* alleged that the defendant "routinely applied for L-1 and B-1 visas instead of H-1B visas to save money and avoid the H-1B lottery process." *Id*. at 67. For its L-1 visa applications, the relator alleged that the defendant "issued fraudulent invitation letters attesting to the

---

[33] *See* A.21 (acknowledging that *Franchitti* involved "the question of whether a defendant decreased or avoided an 'obligation' under [an] alleged 'scheme[]' nearly identical, or at least similar, to that here.").

managerial and/or specialized duties the visa recipients would perform –
much of which was fabricated." *Id.* And, once workers came to the U.S.
on L-1 visas, "the work the employees actually performed did not meet
the criteria for an L-1 visa." *Id.* Cognizant also "brought foreign workers
to the U.S. on B-1 visas to perform billable work that required an H-1B
visa." *Id.* The relator alleged that the government was "deprived of
application fees when Cognizant improperly applied for L-1 and B-1 visas
for work that required a more expensive H-1B visa." *Id.*

Cognizant moved to dismiss the relator's reverse-FCA claims and
argued—like HCL does here—that it only had an "obligation" to pay the
visa application fee for the visas it obtained, even if the category of visa
sought did not authorize the type of work that the employee performed.
*Id.* at 70. The court rejected this narrow interpretation of "obligation"
because it noted that the preferred, modern interpretation of "obligation"
codified in the 2009 amendment to the FCA focuses on "whether the
defendant had a contractual, statutory or regulatory obligation." *Id.*
(citing *Victaulic*, 839 F.3d 242; *Pemco*, 195 F.d 1234). Comparing the
relator's allegations to those approved by the courts in *Victaulic* and
*Pemco*, the court explained:

> Just as the defendant in *Pemco* submitted false
> records to pay less than the true value of the
> airplane equipment, Cognizant submitted false
> statements about the nature of its employees work
> to pay lower visa application fees. And, like the
> marking duty in *Victaulic*, Cognizant's obligation
> to pay the correct visa application fee accrued upon
> its submission of the visa application.

*Id.* at 70-71. The court analogized the "USCIS regulatory scheme" in that case to the statute in *Victaulic* and to the regulation and pre-existing contract in *Pemco*. *Id.* The common thread in all three instances is that the regulations, statute, or contract at issue reflected the type of relationship between a private actor and the government that results in a duty to pay the government, regardless of whether the amount owed is yet fixed, but is distinct from a contingent monetary penalty for general wrongdoing. *See id.*; *supra* § II(B)-(C). Reviewing the reverse-FCA provision and applicable regulatory scheme, the *Franchitti* court found that a "plain language reading of the statute suggests that Cognizant had an obligation to pay the appropriate fee for the privileges associated with its desired visa." *Id.* . The court characterized Cognizant's duty "as based on either an 'implied contractual' or 'fee-based' relationship under 31 U.S.C. § 3729(b)(3)." *Id.*

The *Franchitti* court noted that "there is little case law on this precise issue," but acknowledged one other district court decision, *Lesnik,* in which the court had dismissed a factually similar reverse-FCA claim. *Id.* at 70 (citing 374 F. Supp. 3d at 939). In *Lesnik*, the plaintiff also alleged that "[b]ecause Defendants falsely obtained cheaper [B-1] visas, they avoided an obligation to pay the government the higher fees associated with the more expensive unskilled-worker visa." 374 F. Supp. at 939. Relying primarily on *ATMI*, the *Lesnik* court found that "because no petition-based visa application was made, there was no 'fixed sum that was immediately due,' which is a requirement of an obligation pursuant to *[ATMI]*." *Id.* at 940. The *Franchitti* court later explained that it declined to follow *Lesnik* because it was not controlling and "the rationales of *Pemco* and *Victaulic* were more compatible with a plain reading of the FCA." *Franchitti v. Cognizant Tech. Sols.*, No. 317CV06317PGSLHG, 2022 WL 605745, at *2 (D.N.J. Mar. 1, 2022) ("*Franchitti II*") (denying motion for reconsideration).

Since Cognizant had an "obligation" to seek H-1B visas—and to pay the appropriate application fee for those visas—the court concluded that "[b]y paying for L-1 and B-1 visas but directing its employees to perform

work that required the more expensive H-1B visa, Cognizant decreased – and made false statements material to – its obligation to pay money to the government under 31 U.S.C. § 3729(a)(1)(G)." *Id.*

After its motion to dismiss was denied as to the relator's reverse-FCA claims, Cognizant filed a motion to reconsider or for permission to certify an interlocutory appeal. *Franchitti II,* 2022 WL 605745, at *1. The court denied Cognizant's motion, and reiterated that "Franch[i]tti sets forth a plausible claim by alleging that Cognizant fraudulently applied for less costly L-1 and B-1 visas where its foreign employees were required to obtain more expensive H-1B visas for the type of work they were undertaking." *Id.* at *2.

Here, the district court overlooked that HCL can be held liable under the second prong of the 2009-amended reverse-FCA provision "by directing its employees to perform work that required the more expensive H-1B visa" when it had only obtained and paid for L-1 or B-1 visas for those employees. *See* District Court Dkt. 57 (citing *Franchitti*, 555 F. Supp. at 71); A.21. Since no false statement is required under the second prong of 31 U.S.C. § 3729(a)(1)(G), whether HCL had an "obligation" can be appropriately measured at the time HCL unlawfully utilized

employees to perform work requiring H-1B visas without having sought or paid for H-1B visas. *See Barrick,* 878 F.3d at 1230 (false statement no longer required under second prong of § 3729(a)(1)(G); A.64-69 ¶¶ 95-96, 99, 101-102, 104 (alleging HCL utilizes employees with cheaper L-1 and B-1 visas to perform work requiring a more expensive H-1B visa); *Franchitti*, 555 F. Supp. at 71. HCL clearly had an obligation to obtain H-1B visas, and to pay the fee required for same, before utilizing employees to perform work it knew required an H-1B visa. *See ConAgra*, 465 F.3d at 1201-1202; *Franchitti,* 555 F. Supp. at 71.

The district court in this case acknowledged that *Franchitti* involved "nearly identical" allegations and claims, but chose to follow *Lesnik* instead. A.22. The district court found "the reasoning of the *Lesnik* decision [to be] sound" and explained that it did not find *Franchitti* to be persuasive because (1) it criticized *Franchitti* as "tak[ing and incredibly expansive view of the FCA, [and] expanding FCA liability beyond that contemplated by Congress;" and (2) indicated that it believed a "close reading of [*Pemco* and *Victaulic*] undermines the *Franchitti* court's holding on this issue." A.28-30.

But, the district court erred in relying on *Lesnik*, rather than *Franchitti*, because: (1) the *Lesnik* court's holding was primarily based on (a) the overly restrictive and now-abrogated interpretation of "obligation" from *ATMI* and (b) concessions by the plaintiff's attorney binding only in that case; (2) Congress contemplated and expressly endorsed the broader interpretation of "obligation" reflected in *ConAgra* (and *Franchitti*); (3) *Pemco* and *Victaulic* support the holding in *Franchitti*; and (4) no other case cited by the district court requires or makes a persuasive case for the restrictive interpretation of "obligation" the district court applied here.

First, the district court should not have followed *Lesnik* because that court clearly relied on an abrogated interpretation of "obligation" from *ATMI* and primarily decided the issue based on concessions and choices by that plaintiff's counsel that do not bind the Relators here.[34]

---

[34] The issues with the *Lesnik* decision were likely the result of poor lawyering by the plaintiff's attorney. 374 F. Supp. 3d at 938. The court noted that the plaintiff's counsel had flouted the court's instruction to submit a "more concise and clear pleading" by submitting an amended complaint that was "lengthy," "unclear," "difficult to parse," and "at times incomprehensible." *Id.* The court also noted that the plaintiff's counsel

374 F. Supp. 3d at 940. The *Lesnik* court cited *ATMI* for the proposition that an "obligation under the meaning of the False Claims Act must be for a fixed sum that is immediately due." *Id.* (citing *ATMI*, 190 F.3d. at 735). The court overlooked the fact that Congress had amended the definition of "obligation" in 2009 specifically to invalidate this holding by the *ATMI* court. *Compare id.*, with *Victaulic,* 839 F.3d at 253 (noting that *ATMI* was rejected and abrogated by the 2009 FCA amendment that made clear § 3729(a)(1)(G) is not limited to "fixed" obligations "immediately due"). The *Lesnik* court's reliance on the abrogated holding of *ATMI* impacted its ultimate resolution of the issue in the case, as the *Lesnik* court concluded: "there was 'no fixed sum that was immediately due,' which is a requirement of an obligation pursuant to [*ATMI*]." 374 F. Supp. 3d at 940 (citing 190 F.3d at 735). *ConAgra* and *Franchitti* both demonstrate that applying the more expansive definition of "obligation" of § 3729(b)(3), rather than the overly restrictive and now-abrogated

---

"dismissed with prejudice" eight of the ten defendants just three days before their response to a collective motion to dismiss was due and this had impacted the motion to dismiss briefing. *Id.*

standard from *ATMI*, materially changes the outcome in a case like this. *See supra* pp. 45-55.[35]

*Lesnik* also has limited persuasive value for other cases because the court primarily relied on "strange" concessions from plaintiff's counsel, which are not applicable here. *Id.* at 940 (noting that "[s]trangely, Plaintiffs seem to agree with Moving Defendants' argument" because they conceded that "'[a]n employer is obligated to pay fees *when applying* for petition-based visas.'"); *see, e.g.*, *MKB Constructors v. Am. Zurich Ins. Co.*, No. C13-0611JLR, 2015 WL 1188533, at *23 (W.D. Wash. Mar. 16, 2015) (admissions of counsel are binding on client).

Second, the undisputed legislative history demonstrates that Congress clearly endorsed the broader construction of "obligation" reflected in *ConAgra* (and *Franchitti*) and rejected the narrower interpretation of "obligation" in *ATMI* (and *Lesnik*). When Congress amended the FCA in 2009, it expressly "endorsed" *ConAgra* "for its

---

[35] The *Conagra* court also found that *ATMI* and *Quick* were distinguishable on the facts for reasons equally applicable here because in *ATMI* and *Quick* "no obligation existed independently of the alleged false statements themselves." *Conagra*, 465 F.3d at 1202 (citing and distinguishing *ATMI*, 190 F.3d at 738-41 and *Quick*, 131 F.3d at 773).

interpretation of an FCA 'obligation,'" where the Tenth Circuit declined to dismiss analogous claims, as discussed *supra* pp. 45-50. *See Kane*, 120 F. Supp. 3d at 388 (citing S. Rep. No. 111-10, at 14 n. 14 (2009)). By contrast, Congress made clear that the narrower interpretation of "obligation" from *ATMI* was its impetus for amending the FCA to codify a broader definition of the term. *Victaulic*, 839 F.3d at 253.

Third, both *Pemco* and *Victaulic* support the *Franchitti* court's finding that the relator had alleged the existence of an "obligation." *See Franchitti*, 555 F. Supp. 3d at 70-71; see *also Franchitti II,* 2022 WL 605745 35486, at *2 ("both *Pemco* and *Victaulic* provide substantial precedent in support of the ruling").

In *Pemco*, whose interpretation of "obligation" was endorsed by Congress when it passed the 2009 amendments,[36] the defendant properly faced reverse-FCA liability because it had "decreased its obligation to pay money to the government by misrepresenting the value of the equipment it had purchased from the Air Force." *Pemco*, 195 F.3d at 1236-37. The district court attempted to distinguish *Pemco* from this case and

---

[36] S. Rep. 111-10 at 14 n.14.

*Franchitti* because Pemco "had a specific legal obligation at the time it allegedly withheld information from the government," A.30 (citing *Pemco*, 195 F.3d at 1237), but the district court misread the case. Pemco's "specific legal obligation" was not a "duty to pay" that it decreased through fraud—but rather, a regulatory and contractual duty to accurately inventory the equipment, and then follow the government's instructions for the return or disposal of the equipment. *Pemco*, 195 F.3d at 1235 n.1, 1237. And Pemco did not have a *duty to pay* the true market value for the equipment—airplane wings—"at the time" it fraudulently misrepresented the model number of the wings. *Id.* at 1235-36 & n.1. Rather, Pemco "knowingly used the wrong national stock numbers on th[e] inventory schedule so the government would [subsequently] accept Pemco's offer to purchase." *Id.* at 1236. As such, Pemco's "offer to purchase . . . created only a contingent obligation to purchase— dependent on the government's inspection of the property and acceptance of Pemco's offer." *Id.* Under the abrogated *ATMI* and *Lesnik* standard, such a contingent obligation would not have been actionable under the FCA, but was found actionable in *Pemco* under the standard later codified in 31 U.S.C. 3729(b)(3). *See* S. Rep. No. 111-10, at 14 n.14 (2009)

(endorsing *Pemco*). Moreover, like HCL, Pemco never offered to pay market value for the benefit it sought to obtain. The wings were worth over $2 million, but Pemco only offered and only paid $1875, the scrap value of the obsolete wings Pemco represented it possessed. *Id.* at 1235-36. Similarly, HCL fraudulently obtained the benefit of more expensive H-1B visas, but only applied and paid for L-1 and B-1 visas. Contrary to the district court's reasoning here, where the regulatory scheme required higher payments for the benefits obtained, recovery under the FCA is appropriate. *Id.* at 1236.

In *Victaulic*, a relator brought a reverse-FCA claim against an importer of pipe fittings who had unlawfully imported goods with a mismarked country of origin and avoided ad valoreum duties by falsifying entry documents. 839 F.3d at 245-46. Under U.S. law, it is illegal to import any unmarked or mismarked article, and if such goods are declared by the importer or discovered by customers, the goods must be properly marked, re-exported, or destroyed under government supervision. *Id.* at 254. If the mismarked goods escape detection and are released, the importer must pay a 10% ad valoreum duty. *Id.* The district court in *Victaulic* also denied the relator's motion to amend as futile for

similar reasons as the district court's dismissal here—because "the duties were too attenuated and contingent to qualify as the type of obligations to pay money to the government covered by the FCA," *id.* at 248—and the Third Circuit reversed, *id.* at 258; *see also id.* at 254 (noting that the district court relied on reasoning from *ATMI* that "has been called into doubt, if not entirely abrogated by the FERA").

While the district court attempted to distinguish *Victaulic* on the basis that the "defendant had an existing obligation to pay the marking duty at the time of importation," A.31 (citing *Victaulic*, 839 F.3d at 254-55), it glossed over key facts from *Victaulic* that are irreconcilable with the district court's reasons for dismissing Relators' claim. In *Victaulic*, the district court had reasoned that "an importer does not owe marking duties upon importation of unmarked or mismarked merchandise" because "when mismarked or unmarked goods are in government custody the importer may not simply pay marking duties to obtain the release of such goods." 839 F.3d at 254. Employing the interpretation of "obligation" the district court used in this case to evaluate Relators' claims, the defendant would have escaped reverse-FCA liability in *Victaulic* because "at the time" it imported mismarked goods and made false statements to

customs concealing that fact, the defendants did not have a duty to pay mismarking duties. *Id.* Indeed, paying mismarking duties was *not even* a legal option at that time. *Id.* ("Had Victaulic informed the government of this state of affairs the goods would not have been allowed into the country.").

The *Franchitti* court's reading of *Pemco* and *Victaulic* is consistent with the interpretation of "obligation" that the DOJ urged courts to follow for years, which ultimately was codified in § 3729(b)(3). Under that view, an "obligation" can arise by virtue of the relationship between defendant and the government, where some regulation or statute *independently* establishes a duty to pay, even if some further steps or government action must occur to liquidate that obligation. *ConAgra,* 465 F.3d at 1204.

Fourth, none of the other cases cited by the district court address the specific issue presented here and in *ConAgra, Franchitti*, and *Lesnik.*

*Kasowitz* and *Simoneaux* both stand only for the uncontroversial proposition that an "unassessed, contingent penalty is not an FCA 'obligation' subject to suit under the reverse false claims provision." *U.S. ex. rel. Kaosowitz Benson Torres LLP v. BASF* Corp., 285 F. Supp. 3d 44,

53 (D.D.C. 2017); *U.S. ex re. Simoneux v. E.I. DuPont de Nemous & Co.*, 843 F.3d 1003, 1036-38 (5th Cir. 2016).

In *Grubea*, the court *rejected* the defendants' argument that a duty to pay cannot be considered an "obligation" because it involved a future discretionary act. *U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 702-704 (S.D.N.Y. 2018). The relator alleged that defendants had wrongfully reduced a third party's (Fannie Mae) obligation to pay dividends to the government by fraudulently causing Fannie Mae to reimburse hundreds of thousands of dollars in inflated expenses. 318 F. Supp. 3d at 703. The defendants argued that Fannie Mae did not have an "obligation" to make a payment to the government because it was only required to make a quarterly payment to the government if its board of directors elected, in its sole discretion, to declare a dividend. *Id.* The defendants argued that since Fannie Mae's obligation to pay was "'dependent on a future discretionary act,'" it "was not an 'obligation' for FCA purposes." *Id.* The court rejected this argument because it ignored the practical reality that Fannie Mae had consistently declared dividends in the past. *Id.* at 703-704. It also explained that the defendants' "fraud had the predictable effect of

depriving the Government of money it was owed and is sufficiently connected to Fannie Mae's payment obligations to the Government to state a claim under the FCA." *Id.* at 704.

In *United States ex rel. Taylor v. Gabelli*, the court addressed whether the defendants had an actionable "obligation" under the reverse-FCA only in *dicta*.[37] 345 F. Supp. 2d 131, 339 (S.D.N.Y. 2004). The defendants argued that they had no "obligation" at the time they submitted fraudulent short-form applications because at that point in time, "their duty to pay had not yet 'ripened.'" *Id.* at 338 n.141. But the court *rejected* that argument. *Id.*

*Barrick* and *Petras* both involved materially distinguishable facts. In *Barrick*, the court affirmed the continued validity of *ConAgra,* which is far more analogous to the instant case. 188 F. Supp. 3d at 1238 ("The Tenth Circuit has adopted a broad definition of an FCA obligation, holding that fee-based regulatory burdens may be FCA 'obligations' even where the obligation is not for a 'precise amount' and where the obligation

_____

[37] The court dismissed relator's reverse-FCA claim because it was "redundant" with their allegations under § 3729(a)(1) and (2). *Id.*

is contingent on government discretion.") (citing *ConAgra*, 465 F.3d at 1202-03); *see supra* pp. 45-50. But the court affirmed the district court's dismissal of the reverse-FCA claim in that case because the defendant could never have had the "obligations" that the relator alleged it had wrongfully avoided. *Id.* at 1231-32. The USDA does not charge meat exporters for basic export services, but offers more-intensive *voluntary* inspections for meat exports to countries with stricter import standards. *Id.* at 1228. The relator claimed that the defendant fraudulently avoided paying higher voluntary inspection charges by misrepresenting the true destination country. *Id.* at 1228-29. Part of the scheme involved smuggling meat to China (which was prohibited by U.S. law at the time). *Id.* at 1231. With respect to this portion of the claim, the court explained an inspector would have "never" performed an inspection or charged the defendant for such an inspection for beef identified as being sent to China because of the export ban. *Id.* The court also found that the defendant did not avoid an "obligation" with respect to the other portion of the claim because such an "obligation" could only arise based on "multiple" "implausible" assumptions, including the wrongful conduct of a third party. *Id.* (explaining "*Conagra* is not on point" for this reason).

In *Petras*, the relator claimed that the defendant had avoided an obligation to pay the SBA an accrued dividend (as a preferred shareholder). *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 499-500 (3d Cir. 2017). But the defendant's certificate of incorporation specified two conditions that would require defendant to pay preferred shareholders: (1) the Board choosing to declare the dividend; or (2) the defendant underdoing liquidation. *Id.* The relator did *not* allege that either condition had occurred, or reasonably *could* occur. *Id.* at 502, 506 n.50. As such, the court affirmed that the district court "properly concluded that regardless of the proper definition of 'contingent,' the scenarios [relator] advanced were so speculative that they could not be considered a contingent obligation." *Id.* at 506 n.50.

While the district court also suggested that the lottery process for H1-B visas makes HCL's duty to pay H1-B visa application fees "contingent," *see* A.28, *ConAgra* rejected a similar argument. 465 F.3d at 1204 ("We therefore agree with the government 'that the need for some further governmental action or some further process to liquidate an obligation does not preclude a reverse false claims action.'") (*citing* DOJ's *Amicus* Brief).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded.

Date: November 29, 2022

KOTCHEN & LOW LLP

*/s/Daniel Kotchen*
Daniel Kotchen

*Attorney for Appellants Billington, Aceves, and Dorman*

# STATEMENT OF RELATED CASES

There are no related cases known to Appellants at this time.


Date: November 29, 2022


              KOTCHEN & LOW LLP

              */s/Daniel Kotchen*
              Daniel Kotchen

              *Attorney for Appellants Billington,*
              *Aceves, and Dorman*

# CERTIFICATE OF COMPLIANCE

This brief or other document complies with type-volume limits of Fed. R. App. P. R. 32 and Local Rule 32.1 (14,000 word count limit) because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X] this brief or other document contains 13,486 words

[ ] this brief uses monospaced type and contains [state number of] lines

This brief or other document complies with the typeface and type style requirements because:

[X] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font; or

[ ] this brief or other document has been prepared in a monospaced typeface using [identify word processing program] in [identify font size and type style].

Dated: November 29, 2022

/s/Daniel Kotchen
Daniel Kotchen
Kotchen & Low LLP

*Attorney for Appellants*
*Billington, Aceves, and Dorman*

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: November 29, 2022

KOTCHEN & LOW LLP

*/s/ Daniel Kotchen*
Daniel Kotchen

*Attorneys for Appellants Billington, Aceves, and Dorman*