# No. 22-1854

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA EX REL. RALPH BILLINGTON,
MICHAEL ACEVES, and SHARON DORMAN,

*Plaintiffs/Relators-Appellants*,

v.

HCL TECHNOLOGIES LTD. and HCL AMERICA, INC.

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Connecticut, No. 3:19-CV-01185
Hon. Sarah A. L. Merriam

## APPELLANTS' REPLY BRIEF

Daniel Kotchen
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
dkotchen@kotchen.com

*Attorney for Appellants
Billington, Aceves, and Dorman*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... iii

INTRODUCTORY STATEMENT ........................................... 1

POINTS OF REPLY .............................................................. 1

 I. "Obligation" Includes Unfixed Duties – Like those at Issue Here – Arising from a Regulatory Scheme or Economic Relationship with the Government. ........................................ 1

 II. HCL Reduced an "Obligation" Cognizable Under § 3729(a)(1)(G) by Fraudulently and Unlawfully Underpaying H-1B Wages and Associated Taxes. ........................................ 9

 III. HCL had an "Obligation" to Obtain and Pay for H-1B Visas for Work it Knew Required an H-1B Visa. ........................... 17

 IV. This Court Should Not Consider HCL's Alternative Bases for Affirming Dismissal. ............................................... 21

 V. The Tax Bar Does Not Preclude Relators' FCA Claim. ......... 23

 VI. Relators Sufficiently Pled Scienter. ..................................... 28

  A. HCL Knowingly Underpaid H-1B Wages and Associated Taxes. ........................................................ 29

  B. HCL Failed to Obtain H-1B Visas for Work it *Knew* Required H-1B Visas. ................................................... 31

 VII. Relator has Pled HCL's Fraudulent Scheme with the Degree of Particularity Required by Rule 9(b). ................................. 33

# TABLE OF AUTHORITIES

## CASES

*American Textile Manufacturers Institute, Inc. v. Limited, Inc. ("ATMI"),* 190 F.3d 729 (6th Cir. 1999)......................................................2, 7, 8, 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87 (2d Cir. 2007).29

*Canen v. Wells Fargo Bank, N.A.,* 118 F. Supp. 3d 164 (D.D.C. 2015)..28

*Carter v. G&S Food Shop,* 2013 U.S. Dist. LEXIS 155617, *1 (E.D. Mich. Oct. 10, 2013) ........................................................................28

*Carter v. Subway,* 2012 U.S. Dist. LEXIS 26377, *1 (E.D. Mich. Feb. 29, 2012) ..................................................................................................28

*Certain Underwriters at Lloyd's v. Axon Pressure Prods.,* 951 F.3d 248 (5th Cir. 2020) .......................................................................................22

*Club Retro LLC v. Hilton,* 568 F.3d 181 (5th Cir. 2009).........................22

*Dentsply Int'l Inc. v. Dental Brands for Less LLC,* 2016 U.S. Dist. LEXIS 87345, *5 (S.D.N.Y. July 5, 2016) .............................................30

*Espinoza v. Dimon,* 797 F.3d 229 (2d Cir. 2015)....................................33

*Franchitti v. Cognizant Tech. Sols. Corp.,* 555 F. Supp. 3d 63 (D.N.J. 2021) .................................................................................... passim

*Gibeau v. Nellis,* 18 F.3d 107 (2d Cir. 1994) ........................................21

*Goldberg v. Danaher,* 599 F.3d 181 (2d Cir. 2010) ................................22

*Greene v. I.R.S.,* 2008 U.S. Dist. LEXIS. 103986 (N.D.N.Y. Dec. 23, 2008) ..................................................................................................28

*Guippone v. BH S&B Holdings LLC,* 737 F.3d 221 (2d Cir. 2013) ........22

*Lesnik v. Eisenmann SE,* 374 F. Supp. 3d 923 (N.D. Cal. 2019)........8, 27

*New York ex rel. American Advisory Services, LLC,* 592 F. Supp. 3d 183 (S.D.N.Y. 2022).................................................................................27

*Pirnik v. Fiat Chrysler Automobiles, N.V.,* 2016 U.S. Dist. LEXIS 138439, *23 (S.D.N.Y. Oct. 5, 2016) ................................................29

*Schonfeld v. Hilliard,* 218 F.3d 164 (2d Cir. 2000) ................................22

*SEC v. Wyly,* U.S. Dist. LEXIS 83897, *1 (S.D.N.Y. June 13, 2013) .....24

*U.S. ex rel. Bahrani v. Conagra, Inc.,* 465 F.3d 1189 (10th Cir. 2006) ................................................................................................ passim

*U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC,* 878 F.3d 1224 (10th Cir. 2017) ...............................................................................5, 6

*U.S. ex rel. Chorches v. Am. Med. Response, Inc.,* 865 F.3d 71 (2d Cir. 2017) ..................................................................................................33

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 252 (3d Cir. 2016) ....................................................... 2, 8, 33

*U.S. ex rel. Frey v. Health Mgmt. Sys.*, 2021 U.S. Dist. LEXIS 189408 (N.D. Tex. Oct. 1, 2021) ...................................................... 7, 10, 13, 16

*U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F. 3d 905 (6th Cir. 2017) ............................................................................................... 6

*U.S. ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315 (3d Cir. 2021) .............................................................. 15, 16

*U.S. ex rel. Mason v. State Farm Mutual Automobile Insurance Co.*, 398 F. App'x 233 (9th Cir. 2010) ............................................................. 6

*U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497 (3d Cir. 2017) ........... 7

*U.S. ex rel. Plumbers & Steamfitters Loc. Union No. 38 v. C.W. Roen Constr. Co.*, 183 F.3d 1088 (9th Cir. 1999) .................................... 14, 16

*U.S. ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.*, 843 F.3d 1033 (5th Cir. 2016) ............................................................................. passim

*U.S. ex rel. Sutton v. Double Day Off. Servs., Inc.*, 121 F.3d 531 (9th Cir. 1997) ........................................................................................... 15, 16

*U.S. ex rel. Takemoto v. Nationwide Mut. Ins. Co.*, 674 F. App'x 92 (2d Cir. 2017) .................................................................................... 33

*U.S. ex rel. Todd Heath v. AT&T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015) .. 33

*U.S. ex. rel. Gelbman v. City of New York*, 790 F. App'x 244 (2d Cir. 2019) ....................................................................................... 34

*U.S. ex. rel. Kane v. Healthfirst, Inc.*, 120 F. Supp. 3d 370 (S.D.N.Y. 2015) ........................................................................................... 2

*U.S. ex. rel. Matheny v. Medco*, 671 F.3d 1217 (11th Cir. 2012) ............. 6

*United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71 (2d Cir. 2017) ........................................ 34

*United States v. Neifert-White Co.*, 390 U.S. 228 (1968) ........................ 13

*United States v. Pemco Aeroplex*, 195 F.3d 1234 (11th Cir. 1999) ......... 11

*United States v. Q Int'l Courier, Inc.*, 131 F.3d 770 (8th Cir. 1997) ......... 9

*United States. v. Infosys Ltd.*, Dkt. 2, No. 4:13-CV-634 (E.D. Tex. 2013) ....................................................................................... 14

## STATUTES

26 U.S.C. § 3111(a) ............................................................................. 10

26 U.S.C. § 7401 ........................................................................... 23, 24

31 U.S.C. § 3729(a)(1)(A) .............................................................. 6, 26

31 U.S.C. § 3729(b)(1) ........................................................................ 28

31 U.S.C. § 3729(b)(2) .................................................................. 26
31 U.S.C. § 3729(b)(3) .................................................................... 1
31 U.S.C. § 3729(e) ...................................................................... 25
42 U.S.C. § 1395y(b)(2)(B)(ii) ...................................................... 6

## OTHER AUTHORITIES

Amicus Curiae Brief of the United States in Support of Appellant,
 *Simoneaux*, 843 F.3d 1033 (5th Cir. 2016), Doc. No. 00513523918
 (May 26, 2016), 2016 WL 3090877 ("DOJ *Simoneaux* Br.") .......... 2, 3, 5
Robert Salcido, *The 2009 False Claims Act Amendments: Congress'
 Efforts to Both Expand and Narrow the Scope of the False Claims Act*,
 39 Public Contract L.J. 741 (2010) ...................................................... 15
*United States v. Bourseau, Appellee Br.,* 2007 WL 1577381 .................. 16

## RULES

Fed. R. Civ. P. 12 ........................................................................... 1
Fed. R. Civ. P. 9 ........................................................................ 1, 21

## REGULATIONS

20 C.F.R. § 655.731 ...................................................................... 10
20 C.F.R. § 655.731(a) .................................................................. 12
9 C.F.R. § 322.2 ........................................................................... 20

## LEGISLATIVE MATERIALS

155 Cong. Rec. S 45639 ................................................................... 5
S. Rep. No. 111-10 ..................................................................... 2, 9

## INTRODUCTORY STATEMENT

In granting HCL's Rule 12(b)(6) motion, the district court misinterpreted and misapplied the 2009 amendments to the FCA, and issued a decision that is wrong as a matter of law. This Court should reverse that order and remand for further proceedings.

While HCL devotes roughly half of its Appellee Brief petitioning this Court to affirm the district court's decision based on issues that the court never even addressed (i.e., the FCA tax bar, scienter, and Rule 9(b)'s particularity requirement), this Court need not, and should not, address those issues in the first instance. But even if this Court entertains those issues, HCL's arguments have no merit.

## POINTS OF REPLY

### I. "Obligation" Includes Unfixed Duties – Like those at Issue Here – Arising from a Regulatory Scheme or Economic Relationship with the Government.

An "obligation" to the government to pay can arise from a regulation, contract, or statute imposing a duty to pay, or from the defendant having a relationship with the government that results in a duty to pay the government, even if that duty is not "fixed" in all particulars at the time of the misconduct. *See* 31 U.S.C. 3729(b)(3); App.

Br. at 33-34; Amicus Curiae Brief of the United States in Support of Appellant, *Simoneaux*, 843 F.3d 1033 (5th Cir. 2016), Doc. No. 00513523918 (May 26, 2016), 2016 WL 3090877, *10-14 ("DOJ *Simoneaux* Br.").

Congress defined "obligation" in the 2009 FERA "to make clear. . .that 'unfixed' obligations arising from economic relationships between a person and the government may indeed be the basis for [reverse-FCA] liability even if some governmental action is necessary before they are fixed," *id*. at *14; App. Br. at 28-30, and to reject the requirement of cases like *ATMI* that an "obligation" must be a duty to pay a "fixed sum that was immediately due." *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 252, 253 (3d Cir. 2016); *see* S. Rep. No. 111-10, at 14 & n. 9 (2009).

*Conagra* is particularly instructive, as Congress endorsed the decision when amending the FCA in 2009.[1] *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1202 (10th Cir. 2006). *Conagra* exemplifies

---

[1] *U.S. ex rel. Kane v. Healthfirst, Inc.,* 120 F. Supp. 3d 370, 388 (S.D.N.Y. 2015).

the broader approach toward "obligation" as including "unfixed duties" that Congress sought to codify in its FCA amendment. *See U.S. ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.,* 843 F.3d 1033, 1037-38 (5th Cir. 2016); DOJ *Simoneaux* Br. at *11.

In *Conagra*, the defendant did not immediately "owe" the government a fixed sum of money because it avoided obtaining replacement export certificates that the regulatory scheme required it to obtain. 465 F.3d at 1201-02. There was also an element of uncertainty about whether the defendant would be charged at all for replacement export certificates – even if it had properly sought them – because the USDA had discretion not to charge fees for replacement certificates. *Id.* at 1203-04.

Nevertheless, the *Conagra* court found that the defendant had an actionable "obligation" to pay the government because of the regulatory scheme and the defendant's relationship with the government, even though that duty was not "fixed." *Id.* at 1202.

*Conagra* demonstrates the reverse-FCA provision covers instances where the circumstances, laws, and/or the defendant's relationship with the government would typically result in the defendant having to pay the

government in the normal course, but where the defendant has wrongfully avoided incurring charges for "a fixed sum immediately due" through misconduct. *Id.*

While HCL half-heartedly suggests *Conagra* does not reflect the proper construction of "obligation" that Congress codified in the FERA, Aple. Br. at 57, even HCL's own principal authorities contradict its argument and reflect Congress' endorsement of the decision.

In *Simoneaux*,[2] the court recounted that Congress crafted "obligation" in the FCA specifically to "resolve the active dispute" between: (1) the broader approach, exemplified by *Conagra*, interpreting "obligation" to include "unfixed" obligations; and (2) the narrower approach of *ATMI*, limiting "obligation" to a duty to pay "a fixed sum that is immediately due." 843 F.3d at 1037-38.[3]

---

[2] *See id.* at 12-13 (citing *Simoneaux*).

[3] HCL argues that the legislative history of the FERA indicates that Congress did not embrace unfixed duties like the ones at issue here and in *Conagra,* Aple. Br. at 37-38, but the changes to the final definition were intended to ensure that "obligation" did not include contingent *penalties*. *Simoneaux,* 843 F.3d at 1038 (citing 155 Cong. Rec. S 45639 (daily ed. Apr. 22, 2009) (statement of Sen. Kyl)); *see also* DOJ *Simoneaux* Br. at \*14.

The *Simoneaux* court also agreed with the key holding from *Conagra* that undercuts HCL's argument in this appeal. *Compare Conagra*, 465 F.3d at 1204 (recognizing that "'the need for some further government action or some further process to liquidate an obligation does not preclude a reverse false claims action'") (quotation omitted), with *Simoneaux* 843 F.3d at 1039-40 ("the fact that further governmental action is required. . .does not, standing alone, mean that a duty is not established"); *see also* DOJ *Simoneaux* Br. at *14.

*United States ex. rel. Barrick v. Parker Migliorini International, LLC* further confirms the validity of *Conagra*. 878 F.3d 1224, 1231-33 (10th Cir. 2017); see Aple. Br. at 13-14. There, the Tenth Circuit affirmed its previous reasoning in *Conagra*, but distinguished the alleged obligation before it as "potential and contingent. . .because it depends on multiple assumptions, as well as a third party's wrongful acts." *Barrick*, 878 F.3d at 1233 ("*Conagra* is not on point."); *see also* App. Br. at 65-66 (distinguishing *Barrick*).

HCL argues that a duty to pay is "contingent" and not "established" – and therefore cannot constitute an "obligation" cognizable under § 3729(a)(1)(G) – if any further step is required before payment becomes

due, or if there is any element of uncertainty that payment will ultimately be required. Aple. Br. at 12-16. But HCL's argument is primarily based on misleading quotes from inapposite cases,[4] and is belied by the more persuasive and relevant interpretations of § 3729(b)(3).

For example, HCL quotes from *Barrick* that "there is no liability for obligations to pay that are merely potential or contingent," see Aple. Br. at 13 (quoting 878 F.3d at 1231), but that court's holding was much narrower: that the plaintiff has failed to plead an actionable obligation where fees being owed to the government depended on "implausible" "future discretionary act[s]. . .by a third party" that were themselves

_____

[4] *U.S. ex rel. Matheny v. Medco* is inapposite because the existence of an obligation was not disputed or at issue there. 671 F.3d 1217, 1223 (11th Cir. 2012). *U.S. ex rel. Mason v. State Farm Mutual Automobile Insurance Co.* is inapposite because the defendant's invoice to Medicare was not false, as a matter of law, due to a very specific regulatory provision applicable there. 398 F. App'x 233, 235 (9th Cir. 2010). For the same reason, the court found that there was no existing obligation. *Id.* (citing 42 U.S.C. § 1395y(b)(2)(B)(ii)). In *U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.*, the relator's reverse-FCA claim was premised on an unsuccessful § 3729(a)(1)(A) claim, so failed without meaningful "obligation" analysis. 874 F.3d 905, 916-17 (6th Cir. 2017).

"wrongful acts." 878 F.3d at 1232; *see also U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505-06 & n.50 (3d Cir. 2017) (finding no obligation where defendant's duty was "dependent on a future discretionary act" and relator "d[id] not allege that [the act] had [materialized] or. . .when [it] would have materialized" and finding that any such duty to pay was too attenuated and speculative regardless of the exact nature of "obligations" actionable under the reverse-FCA provision).

The key distinction between an unfixed duty to pay and a contingent penalty is that regulations/statutes imposing potential penalties only "create[] an obligation to obey the law, not an obligation to pay money." *Simoneaux*, 843 F.3d at 1037, 1040; *see also U.S. ex rel. Frey v. Health Mgmt. Sys.*, 2021 U.S. Dist. LEXIS 189408, *25 (N.D. Tex. Oct. 1, 2021) ("Stated another way, the current definition of obligation turns on whether a duty to pay the Government funds exists, or only a duty not to break the law.").

Because Congress rejected *ATMI* and made clear that an "obligation" is not limited to circumstances where defendants have a duty

to pay a "fixed sum immediately due,"[5] the *Lesnik v. Se* court erred in dismissing claims similar to those here based on that abrogated standard. 374 F. Supp. 3d 923, 940 (N.D. Ca. 2019) ("[B]ecause no petition-based visa application was made, there was no 'fixed sum that [was] immediately due,' which is a requirement of an obligation pursuant to [*ATMI*].").[6] The district court here reproduced the *Lesnik* court's error when it found that "Plaintiffs' reverse FCA claim under 31 U.S.C. §3729(a)(1)(G) fails because Plaintiffs have not shown that Moving Defendants applied for a visa that obligated Defendants to pay a higher ***'fixed sum that is immediately due.'"*** App.22 (quoting *Lesnik*, 374 F. Supp. 3d at 940) (emphasis added); *see also* App.28.

HCL attempts to argue that *Lesnik*'s use of the abrogated *ATMI* standard – requiring an "obligation" to be for a "fixed sum immediately

---

[5] *See Simoneaux*, 843 F.3d 1037-38; *Victaulic*, 839 F.3d at 253-54 ("the FERA expressly rejected *ATMI*'s narrow interpretation of the FCA's reverse false claims provision in favor of a more broadly inclusive definition").

[6] "'[A]n obligation under the meaning of the False Claims Act[] must be for a fixed sum that is immediately due.'" *Id.* (quoting *ATMI*, 190 F.3d at 735.

due" – was just dicta. Aple. Br. at 60. According to HCL, *Lesnik* primarily relied on *ATMI* for the proposition that an "'obligation cannot be merely a potential liability.'" Id. (quoting *Lesnik*, 374 F. Supp.3d at 940). But HCL overlooks that the *ATMI*'s comment that an obligation "cannot be merely a potential liability" is necessarily intertwined with its abrogated holding that a duty "must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed." *ATMI*, 190 F.3d 729, 735 (6th Cir. 1999) (quoting *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 735 (8th Cir. 1997)). Congress clearly rejected this view by defining "obligation" to include duties "aris[ing] across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that results in a duty to pay the Government money, whether or not the amount owed is yet fixed." S. Rept. 111-10.

## II. <u>HCL Reduced an "Obligation" Cognizable Under § 3729(a)(1)(G) by Fraudulently and Unlawfully Underpaying H-1B Wages and Associated Taxes.</u>

HCL argues that its "obligation" to pay higher H-1B wages and associated taxes is not cognizable under § 3729(a)(1)(G) because that

obligation was "merely potential or contingent." Aple. Br. at 16. However, HCL does not challenge that it had fixed legal duties to pay the H-1B wage amounts required by 20 C.F.R. § 655.731, and to pay the taxes on the wages it pays per 26 U.S.C. § 3111(a). Instead, HCL only criticizes Relators for urging these legal duties be considered in tandem. Aple. Br. at 50 ("Plaintiff tries to stitch together a requirement to pay certain wages with the contingent duty to pay employment taxes on the allegedly underpaid wages."). According to HCL, its duty to pay payroll taxes was "speculative" and "contingent" because that duty is based on the actual wage amount HCL pays H-1B visa employees. *Id.* at 16-17. But HCL cites no cases in which a defendant was excused from a duty (e.g., to pay taxes) because it had wrongfully failed to comply with a related antecedent duty (*e.g.*, to pay the required wage rate) and overlooks cases that conclude otherwise.

In *Frey*, the relator brought a reverse-FCA claim against a defendant provider of third-party liability ("TPL") services who had contracted with many state Medicaid agencies. 2021 U.S. Dist. LEXIS 189408, *2. Under Medicaid regulations, states have an obligation to pay the federal government a portion of reimbursements they receive from

third-party insurers. *Id.* at *23. States also have a related antecedent regulatory duty to seek reimbursement from third parties. *Id.* at *2-4, 25. The relator alleged that the defendant had knowingly and wrongfully reduced an obligation to the government by failing to timely bill TPL claims, thereby reducing an obligation to pay the government. *Id.* at *2-4. The defendant argued that its "obligation" to the government was "too speculative" because it only had an obligation to pay the government portions of TPL reimbursements it actually received (which relator did not challenge). *Id.* at *24. The court rejected this argument because "federal statute and regulations impose[d] a duty upon the Defendant to seek reimbursement from third parties." *Id.* The court explained that "Defendant's alleged failure to bill liable third parties does not allow Defendant to avoid this obligation to collect and remit payments to state Medicaid agencies, who in turn must reimburse the government" and "[n]or is anything about the obligation owed by the Defendant speculative." *Id.*

The *Pemco* court also found an "obligation" in an analogous situation. 195 F.3d at 1235, 1237 (finding defendant wrongfully reduced an actionable duty to pay full value of airplane wings based on

defendant's violation of related antecedent duty to provide an accurate inventory of those wings). While HCL attempts to distinguish *Pemco* by inaccurately representing that Pemco "had a contract spelling out its obligation to pay the government for the parts' 'full value,'" Aple. Br. at 58, the applicable requirements provided only that "the contractor *may* offer to purchase the property from the government, and the government *can* elect to sell the property to the contractor." 195 F.3d at 1235 (emphasis added).[7]

HCL clearly had a *fixed* legal obligation to pay H-1B visa employees the wage amounts required by 20 C.F.R. § 655.731(a). App.40-41 ¶ 23. HCL's violation of that antecedent duty directly, proportionally, and wrongfully reduced HCL's associated duty to pay taxes on those wage amounts. As in *Frey*, HCL's underlying violation of an established legal duty that directly, proportionally, and wrongfully decreased its associated obligation to pay the government is neither "speculative," nor

---

[7] Alternatively, *Pemco* could have accounted for the property's full value by "return[ing] the property" or complying with "alternative disposition instructions" from the government, but it chose not to. *Id.*

a defense to reverse-FCA liability. 2021 U.S. Dist. LEXIS 189408, *25. HCL's argument that it had "no 'obligation' to pay the government extra employment taxes on wages never paid," Aple. Br. at 20, rings equally hollow as the *Frey* defendant's argument that it had no duty to pay third party reimbursements it never sought or collected. 2021 U.S. Dist. LEXIS 189408, *25.

HCL also argues that application of the FCA to the underpayment of wages in violation of a federal statute or regulation would exceed the purpose of the FCA as recognized by the Supreme Court. Aple. Br. at 18. But the Supreme Court has stated that the FCA "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," and "has consistently refused to accept a rigid, restrictive reading." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

The DOJ – which played an integral role in shaping the final definition of obligation[8] – has used the FCA to recover FCA damages

---

[8] *See* Aple. Br. at 37-38.

resulting from a similar visa fraud scheme to decrease an obligation to pay required H-1B wage amounts and associated taxes. *See United States. v. Infosys Ltd.*, Dkt. 2, No. 4:13-CV-634 (E.D. Tex. 2013) (Ex. 1). In *Infosys*, the DOJ brought an FCA lawsuit against Infosys (one of HCL's competitors) for a visa fraud scheme where the defendant was fraudulently obtaining and using B-1 visas for work requiring H-1B visas. *Id.* at II(A)-(C), (E), (H). The DOJ specifically alleged that one of the purposes of Infosys' visa fraud scheme was "avoiding tax liabilities." *Id.* at II(E)(2).[9]

Courts have also long recognized that, "[c]ontrary to [defendant's] suggestion, the FCA does indeed extend to false statements regarding the payment of prevailing wages." *U.S. ex rel. Plumbers & Steamfitters Loc. Union No. 38 v. C.W. Roen Constr. Co.*, 183 F.3d 1088, 1089, 1092 (9th Cir. 1999) (applying FCA to contractor on federally-funded project that failed to pay prevailing wage as required by federal law); *accord U.S. ex*

---

[9] Infosys paid a $34 million settlement. *See* https://www.justice.gov/usao-edtx/pr/indian-corporation-pays-record-amount-settle-allegations-systemic-visa-fraud-and-abuse.

*rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 325, 354 (3d Cir. 2021) (same); *U.S. ex rel. Sutton v. Double Day Off. Servs., Inc.*, 121 F.3d 531, 534 (9th Cir. 1997) (same with regards to federal contractor); *Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F. Supp. 3d 63, 74 (D.N.J. 2021) (applying FCA claim for underpayment of payroll taxes to defendant that failed to pay prevailing wage as required by visa laws).

HCL speculates that allowing the FCA to be used in cases of underpaid wages would create a slippery slope that would lead to its use against any employer that underpays wages, including private employers with no ongoing economic or business relationship with the government. Aple. Br. at 18-20. But an FCA "obligation" requires an ongoing business

or economic relationship between the defendant and the government.[10]

Courts have only found that the FCA applies to underpayment of wages in situations involving an ongoing economic or business relationship between the federal government and the defendant, such as federal contractors (*e.g.*, *Double Day*, 121 F.3d at 534) or contractors on federally-funded projects *(e.g., C.W. Roen*, 183 F.3d at 1089; *Farfield*, 5 F.4th at 325) or where the government provides benefits to the defendant (such as visas) in exchange for fees pursuant to a regulatory scheme (*e.g., Franchitti*, 555 F. Supp. 3d at 74). While *Frey* demonstrates that a defendant's "obligation" to the government can combine two related duties both owed to the government, this principle likely would not extend to situations where one component of the duty is not required by

---

[10] *See* Robert Salcido, *The 2009 False Claims Act Amendments: Congress' Efforts to Both Expand and Narrow the Scope of the False Claims Act*, 39 Public Contract L.J. 741, 744, 783 (2010) (observing that Congress declined to expand FCA to situations where defendant had no "ongoing economic or business relationship with the United States"); *Bourseau* DOJ Br. at 10 ("These relationships . . . are at the core of the concerns Congress has had in shaping the FCA."). Such a relationship would not exist in the alarmist situations referenced by HCL, such as private contracts or local contractors with no significant nexus to the federal government. Aple. Br. at 19-20.

law or government contract. 2021 U.S. Dist. LEXIS 189408, *2-4; *supra* at 10-11.[11]

Other required elements for reverse-FCA liability, including, e.g., scienter, also serve to preclude FCA liability from attaching to "every [] failure to pay required wages." Aple. Br. at 19; *see e.g., infra* § VI (demonstrating that HCL knowingly and fraudulently flouted U.S. immigration laws to wrongfully capture profits).

Thus, allowing FCA claims related to the failure to pay prevailing wages here – where HCL repeatedly made ongoing false certifications pursuant to a regulatory and fee-based relationship with the government – is well-supported by the FCA statute and by precedent, and allowing such claims has not resulted in, and will not result in, the dire consequences foretold by HCL.

## III. HCL had an "Obligation" to Obtain and Pay for H-1B Visas for Work it Knew Required an H-1B Visa.

Relators pled a cognizable reverse-FCA claim based on HCL's

---

[11] Relators' claim is based on both prongs 1 and 2 of § 3729(a)(1)(G). Few FCA claims could be based on a defendant making repeated and ongoing false certifications to the government about paying required wage levels.

wrongful avoidance or decreasing of its "obligation" to seek and to pay for H-1B visas because like the defendant in *Conagra* had an obligation to obtain, and to pay for, replacement export certificates before making the hide/meat shipments for which those certificates were required, 465 F.3d at 1202-1203, HCL had an obligation to obtain and pay for H-1B visas before instructing foreign workers to perform work HCL knew required H-1B visas.

HCL argues that it only had an "obligation" to pay H-1B visa application fees when it applied for H-1B visas, but no obligation to pay fees for H-1B visas it fraudulently avoided obtaining. Aple. Br. at 49-50, 61. However, *Conagra* demonstrates that HCL's argument is wrong, and Congress' amendment of the reverse-FCA provision specifically to include the type of obligation at issue in *Conagra* demonstrates that HCL's analogous conduct is also actionable under the FCA.

*Conagra* claimed that it never owed fees for replacement export certificates in the same sense that HCL argues that it never owed H-1B visa application fees. 465 F.3d at 1201. *Conagra* argued that it had no "obligation" to pay replacement export certificate fees because such fees only became due – in the same strict sense that HCL now urges in this

appeal – "after (1) the exporter notifies the USDA of the errors and omissions that need to be changed, (2) the USDA determines that 'an in lieu of' or replacement certificate is required; and (3) the USDA charges a fee." *Id.* But the court rejected this argument because "there are instances in which a party is required to pay money to the government, but at the time the obligation arises, the sum has not been precisely determined." *Id.* The court found that the defendant had an obligation to obtain and pay for export certificates by virtue of the regulatory scheme. *Id.* at 1202-04.

HCL tries to distinguish *Conagra* on the basis that the regulations at issue there "required *Conagra* to obtain replacement certificates," but that HCL was not required to obtain H-1B visas. Aple. Br. at 50-51, 55-56. HCL argues that it "has no duty to use foreign workers" and "certainly no duty to use any particular foreign worker." *Id.* at 51.

But HCL's argument is misdirection. While HCL was not required to use foreign employees for work in the U.S., HCL systemically did so during the relevant time, and continues to do so. App.36, 50-71. Specifically, HCL utilized foreign workers for work that HCL knew required H-1B visas, without obtaining or paying for H-1B visas. *Id.* 64-

71; *see Franchitti*, 555 F. Supp. 3d at 71. In *Conagra*, the defendant could have chosen *not* to make the shipments that required export certificates. *See* 465 F.3d at 1193; 9 C.F.R. 322.2. But instead, *Conagra* skirted its obligation to obtain and pay for replacement export certificates before making those shipments, 465 F.3d at 1202-03, just as HCL skirted its obligation to obtain and pay for H-1B visas before having foreign workers perform work in the U.S. that HCL knew required H-1B visas. App.64-69.

HCL attempts to distinguish *Conagra* on the basis that its obligation to obtain and pay for H-1B visas is less "automatic" than the *Conagra* defendant's obligation to obtain and pay for replacement export certificates. Aple. Br. at 56-57. But HCL has an "automatic" obligation to obtain H-1B visas for foreign visa workers it brings to the U.S. to perform work that it knows requires an H-1B visa. *Conagra,* 465 F.3d at 1202-03; *Franchitti*, 555 F. Supp. 3d at 71.

While the H-1B visa lottery means that HCL might not ultimately be required to pay for some of the H-1B visas that it seeks, the *Conagra* court found that a similar potential uncertainty about whether a fee would actually be charged in a counterfactual where the defendant did

not fraudulently avoid the proper process "does not mean that the 'obligation' is a contingent one outside the scope of the [reverse-FCA provision]." 465 F.3d at 1204.

## IV.  **This Court Should Not Consider HCL's Alternative Bases for Affirming Dismissal.**

HCL urges this Court to affirm dismissal of Relators' claims based on grounds not addressed by the district court, including entirely new arguments that HCL did not raise at the district court level. Aple. Br. at 21-34, 52-54.

HCL now argues – for the first time in its Appellee Brief – that Relators failed to satisfy Rule 9(b) by not identifying specific instances where HCL underpaid H-1B wages and taxes. *Compare* Aple. Br. at 27-30, *with* District Court Dkts. 53, 63. HCL also challenges Relators' pleading of scienter for entirely new and different reasons. *Compare* Aple. Br. at 25-27, 30-34, 52-54, *with* District Court Dkt. 53 at 16-18. This Court should not address these new arguments because HCL has not shown that the interest of justice requires their consideration in this appeal. *Gibeau v. Nellis*, 18 F.3d 107, 109 (2d Cir. 1994).

This Court should also decline to consider other issues the district

court did not address, App.32, such as HCL's Tax Bar defense,[12] because "it is [this Court's] distinctly preferred practice to remand such issues for consideration by the district court in the first instance." *Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000); *accord Goldberg v. Danaher*, 599 F.3d 181, 184 (2d Cir. 2010) (same); *see also e.g., Guippone v. BH S&B Holdings LLC*, 737 F.3d 221, 228 (2d Cir. 2013). This preferred practice is sensible here because HCL's alternative arguments for affirming dismissal present issues involving both law and fact.

It is better practice to decide these issues, if necessary, with the benefit of the district court's initial decision [13] and full appellate briefing.[14]

------

[12] Aple. Br. at 21-25.

[13] The district court has discretion to allow Relators to amend the complaint if it credits HCL's arguments that Relators' scienter allegations are insufficient, or that the Tax Bar prevents using lost tax revenue as a measure of damages. *See Club Retro LLC v. Hilton,* 568 F.3d 181, 215 n.34 (5th Cir. 2009) ("[the] district court is best situated to determine when plaintiffs have had sufficient opportunity to state their best case").

[14] Relators had no reason to previously brief these issues, *see Certain Underwriters at Lloyd's v. Axon Pressure Prods.,* 951 F.3d 248, 273 n.19 (5th Cir. 2020), and can only address them in an abbreviated fashion now.

## V. The Tax Bar Does Not Preclude Relators' FCA Claim.

Even if it were appropriate to consider on the merits, HCL's argument that 26 U.S.C. § 7401 and/or the FCA's Tax Bar provide an alternate basis for affirming dismissal of a portion of Relators' FCA claim fails. Aple. Br. 21-25.

Section 7401 precludes private parties from pursuing a "civil action for the collection or recovery of taxes." 26 U.S.C. § 7401. It is inapplicable to Relators' FCA claims here for three reasons.

First, Relator is seeking to recover statutory penalties and damages pursuant to 31 U.S.C. § 3729(a)(1)(G), *see* App.82, not to recover "taxes" under the Internal Revenue Code. *See, e.g.*, *Patriot Tax Int'l, LLC v. Diaz*, 2008 U.S. Dist. LEXIS 57577, *13 (E.D. Ky. 2008) (accepting defendant's argument that "it [did] not seek the collection of income taxes, but instead [sought] damages based upon the statutory penalties set forth in the FCA," and deciding the Tax Bar issue on other grounds). The FCA allows a relator to recover, on behalf of the government, "a civil penalty of not less than $5,000 and not more than $10,000,. . .plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. 3729(a)(1)(G); *see Conagra*, 465 F.3d at 1203 (the

ability to bring an FCA claim is not dependent on the type of damages sought, as an FCA claim can be brought without proof of damages to the government).

Second, Section 7401 only applies where a relator is literally seeking the recovery of taxes – but not where the degree of harm suffered by the government in connection with the illegal conduct is used as a measure for a different civil remedy (here, FCA penalties and treble damages). *See SEC v. Wyly,* U.S. Dist. LEXIS 83897, *1-2, 6-7 (S.D.N.Y. June 13, 2013). In *Wyly*, the defendants violated U.S. securities laws by failing to disclose their beneficial ownership of certain securities, and the SEC requested a disgorgement remedy which it measured by the amount of federal taxes the defendants had avoided by transferring stock options to offshore corporations. *Id.* The defendants challenged the SEC's authority to seek disgorgement measured by the tax liability defendants evaded because they claimed that the IRS has exclusive authority to collect taxes under Section 7401, and that the disgorgement remedy was the "equivalent of a tax collection action." *Id.* The *Wyly* court rejected the defendants' argument and found that the SEC's action did not violate Section 7401 because it was "*not* a civil action for the collection or

recovery of taxes," but a "civil action for securities law violations, the *remedy* for which is measured by the amount of taxes avoided." *Id.* at \*10. The court also explained that the "Tax Code is irrelevant to the success of the SEC's claims in this case – only the requested remedy is measured by reference to provisions of the Tax Code – therefore the SEC's requested remedy does not literally run afoul of Section 7401." *Id.*

Third, HCL's Section 7401 argument is empirically incorrect. *See e.g.*, Ex. 1 (DOJ asserting and settling FCA claims against HCL competitor Infosys for immigration law violations for purpose of "avoiding tax liabilities" following DOL and State Department investigation, without any IRS involvement).

The FCA's Tax Bar is also inapplicable here because Relators' reverse-FCA cause of action is not based on any fraudulent "claim," "record," or "statement" under the Tax Code. 31 U.S.C. § 3729(d); *see Patriot Tax Int'l,* 2008 U.S. Dist. LEXIS 57577, \*9 ("Congress could not have expressed its intent more clearly than it did in § 3729(e) that causes of action involving fraudulent claims, records, or statements made to the government under the Tax Code are expressly excluded from the scope of the FCA."). First, Relators' reverse-FCA cause of action is clearly not

based on any false "statement" or "record" by HCL under the Tax Code. Indeed, Relators affirmatively alleged that HCL did not make any false "statement" or "record" under the Tax Code, or otherwise violate the Tax Code. App.72. Second, Relators' reverse-FCA cause of action is not based on any fraudulent "claim" under the Tax Code. As used in the FCA, a "claim" means a request or demand for money presented to the government for payment. 31 U.S.C. § 3729(b)(2). Relators' reverse-FCA cause of action is not based on any "claim" under the Tax Code,[15] but rather, on HCL's fraudulent decreasing of an "obligation" to the government.[16]

In *Lissack*, this Court articulated a two-part test to help determine whether claims come "within the language and evident intent of the Tax Bar": (1) whether the case depends entirely on a purported violation of

---

[15] A "claim" is a prerequisite for an FCA claim under 31 U.S.C. § 3729(a)(1)(A) or (B), but is not a component of a reverse-FCA claim under 31 U.S.C. § 3729(a)(1)(G).

[16] The Tax Bar does not refer to "obligations" owed under the Tax Code, 31 U.S.C. § 3729(d), even though the Tax Bar and the reverse-FCA provision were added to the FCA at the same time. *U.S. ex rel. Lissack v. Sakura Global Cap. Mkt.,* 377 F.3d 145, 152 (2d Cir. 2004).

the Tax Code (*i.e.*, a false "claim, statement, or record" under the Tax Code); and (2) whether the IRS has authority to recover the precise amounts relator is seeking. *Id.* at 153. Here, both *Lissack* factors demonstrate that the Tax Bar does not apply to Relators' claim*, see Franchitti*, 555 F. Supp. 3d at 73-74, and HCL does not argue otherwise. Aple. Br. at 22-23.

Instead, HCL misconstrues *Lissack* as interpreting the Tax Bar to preclude FCA claims "seeking to recover federal taxes." *Id.* But that was not the issue or holding in *Lissack* because – like the instant case – the relator there was not "*strictly speaking*, seek[ing] to recover federal taxes." *Lissack*, 377 F.3d at 153 (emphasis added); *see supra* at 23 (explaining that Relators are not "seeking to recover taxes").[17]

_____

[17] HCL's other cases construing or discussing the Tax Bar are inapposite, unpersuasive, or both. App. Br. at 22-25. In *Lesnik v. Eisenmann SE,* the court's resolution of the Tax Bar issue was driven by that relator's failure to challenge the issue and the court's analysis of the Tax Bar is abbreviated and difficult to parse. 2018 U.S. Dist. LEXIS 170373, *13-15 (N.D. Cal. 2018). *New York ex rel. American Advisory Services, LLC* discusses *Lissack* and the Tax Bar in passing, but did not even involve any § 3729 claim or any claim that the Tax Bar applied. 592 F. Supp. 3d 183, 211-12 (S.D.N.Y. 2022). In each of *Greene v. IRS*, *Canen v. Wells Fargo Bank, N.A., Carter v. G&S Food Shop*, and *Carter v. Subway Store*

## VI.  Relators Sufficiently Pled Scienter.

This Court should not consider the merits of HCL's challenge to Relators' pleading of scienter, *see supra* § IV, but that challenge also fails on the merits.

Section § 3729(a)(1)(G) imposes liability on defendants who act "knowingly," which means the defendant "has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information," but does not require a "specific intent to defraud." 31 U.S.C. § 3729(b)(1).

Under Fed. R. Civ. P. 9(b), "intent, knowledge, and other conditions of a person's mind may be alleged generally." "In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: 'by alleging facts (1) showing that the defendants had both motive and

---

*#6319*, the courts dismissed frivolous *pro se* claims for a host of obvious deficiencies, discussing the Tax Bar only briefly in passing. *Greene*, 2008 U.S. Dist. LEXIS 103986, *1-2, 18-19 (N.D.N.Y. Dec. 23, 2008); *Canen,* 118 F. Supp. 3d 164, 166, 169-170 (D.D.C. 2015); *G&S Food Shop,* 2013 U.S. Dist. LEXIS 155617, *1-2, 5-9 (E.D. Mich. Oct. 10, 2013); *Subway*, 2012 U.S. Dist. LEXIS 26377, *1, 10-16 (E.D. Mich. Feb. 29, 2012).

opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 U.S. Dist. LEXIS 138439, *23 (S.D.N.Y. Oct. 5, 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). The inquiry "'is highly fact-based.'" *Id.* at 24 (quotation omitted).

### A.   HCL Knowingly Underpaid H-1B Wages and Associated Taxes.

Relators' allegations show that HCL knowingly underpays H-1B visa workers in violation of U.S. visa laws. App.52-56 ¶¶ 65-75, Exs. 57, 63, 64, 65, 66, 67. Relators' operative complaint and exhibits demonstrate not only that HCL systematically and knowingly underpays H1-B visa employees compared to local hires (in violation of U.S. immigration law), but that HCL: (1)  has sought to increase its utilization of H-1B visa workers specifically for this reason, *see* Exs. 39, 65, 66, and (2) that HCL expressly chose to implement a strategy where it concentrated its H-1B applications and H-1B labor pool in a limited set of areas where the difference in pay between local hires and H-1B visa employees is the greatest to maximize its labor arbitrage in violation of U.S. immigration laws. *Id.* ¶¶ 65-67, 68-75; Ex. 57.

While HCL now defends its conduct at issue as only "distasteful," but not illegal, because it was purportedly "locating H-1B workers in parts of the United States where HCL has no comparable, non-H-1B employees and where prevailing wages are lower than they are in other parts of the country," this explanation comes from thin air, not from inferences this Court must draw from Relators' allegations or exhibits. Aple. Br. at 26 (citing nothing). In fact, Relators' allegations and exhibits show that HCL pays local hires as much as 70% more than H-1B visa employees, *see* App.52-57, ¶¶ 66-76, Ex. 57, and Relators have even identified concrete examples where HCL paid H-1B visa employees less than local hires in the *same role* and in the *same location*. App.56 ¶ 74 (discussing Ex. 65 at 1). Relators have also shown that HCL has paid H-1B visa workers *less* than the required LCA wage rate. *Id.* ¶ 73 (discussing Exs. 63 and 64). While HCL tries to spin Relators' exhibits as showing that HCL actually "tries to address the issue to ensure compliance," Aple. Br. at 32-33, this narrative must be reserved for the ultimate factfinder, as information from exhibits must be construed in Relators' favor at this stage. *See Dentsply Int'l Inc. v. Dental Brands for Less LLC*, 2016 U.S. Dist. LEXIS 87345, *5 (S.D.N.Y. July 5, 2016)

("Defendant's reliance on fact-based arguments . . . is wholly inappropriate."). HCL's culpability is further demonstrated by its refusal to share information about visa employee salaries with Relator Billington, even though that information was within his job responsibilities. App.57 ¶ 77.

### B. HCL Failed to Obtain H-1B Visas for Work it *Knew* Required H-1B Visas.

Relators have sufficiently shown that HCL fraudulently obtained B-1/L-1 visas and wrongfully used B-1/L-1 visa workers for work it *knew* required H-1B visas. First, HCL "routinely sought L-1 visas – in lieu of H-1B visas – for. . .roles [that] were not supervisory (as required for an L-1A visa) and did not require uncommon knowledge (as required for an L-1B visa)." App.66 ¶  99. HCL *knew* the work required an H-1B visa – not an L-1 visa – because HCL directed employees, including Relator Billington, to exaggerate and falsify the roles and qualifications of workers for whom it was seeking L-1 visas. App.66-67 ¶ 100. Second, HCL fraudulently sought L-1 visas after H1-B applications for the same person and role were rejected. App.64 ¶ 95; Ex. 43 at 7. This demonstrates that HCL circumvented the H-1B visa process, and wrongfully reduced its obligation to pay more expensive H-1B visa fees,

by fraudulently obtaining L-1 visas and instructing L-1 visa workers to perform work it knew required H-1B visas. *See id.* Third, HCL utilizes L-1 visa holders when there is H-1B demand and H-1B visas should instead be used to meet these staffing needs. App.65 ¶ 96 (discussing Exs. 44-45). Fourth, HCL often employs workers on an L-1 visa for three years, then converts those same workers to H-1B visas to stay in the U.S. without a change in roles. *Id.* ¶ 97 (discussing Exs. 46-48). Fifth, although HCL is well-aware that B-1 workers are not permitted to perform labor or billable work in the U.S., once HCL secures B-1 visas for employees, it has them travel to the U.S. to perform paid client work that requires an H-1B or L-1 visa. App.67-68, ¶¶101-103 (discussing Exs. 51-56). Sixth, Relators observed HCL secures B-1 visas for employees whose applications for H-1B or L-1 visas had been rejected and used B-1 visas for employees to perform billable work. App.69,71 ¶¶ 104, 110-11. Seventh, Relators alleged that HCL falsely represents that the trip's purpose complies with the B-1 visa requirements when applying for B-1 visas. App.68-69 ¶ 103. Eighth, HCL's culpability for fraudulently obtaining and misusing B-1 visas is demonstrated by its efforts to shuffle B-1 visa holders back to India every few weeks to evade detection.

App.69-70 ¶¶ 106-08.

In *Franchitti*, the court found that a relator had pled sufficient facts to satisfy the FCA's scienter requirement with very similar allegations and supporting evidence as here. 2021 U.S. Dist. LEXIS 155008, at*8,18.

## VII. Relator has Pled HCL's Fraudulent Scheme with the Degree of Particularity Required by Rule 9(b).

HCL's argument that Relators have not satisfied Rule 9(b) because they have not provided specific examples of its underpayment of H-1 wages and taxes, Aple. Br. at 27-30, should not be considered, *see supra* § IV, and also lacks merit.

This Circuit has repeatedly recognized that that the degree of particularity required Rule 9(b) is "'case-and context-specific.'" *U.S. ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (quoting *Espinoza v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015)). To satisfy Rule 9(b) for a reverse-FCA claim, a plaintiff need only allege the "particular details of a scheme paired with reliable indicia that lead to a strong inference that. . .obligations [were actually] avoided." *Victaulic*, 839 F.3d at 258; *U.S. ex rel. Todd Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (both cited with approval in *U.S. ex rel. Takemoto v. Nationwide Mut. Ins. Co.*, 674 F. App'x 92, 95 n.1 (2d Cir. 2017)). HCL's

reliance on *Chorches* and *U.S. ex. rel. Gelbman v. City of New York* is misplaced because the issue in those cases was the degree of specificity required to show that a "claim" was "submitted" to the government, which is not part of a reverse-FCA claim. 865 F.3d at 81; 790 F. App'x 244, 249 (2d Cir. 2019). Based on the context of the reverse-FCA claim involved, Relators have provided sufficient details of HCL's scheme to underpay H-1B wages and taxes, as well as reliable indicia that HCL actually reduced its obligation to pay the same. *See* App.51-57 ¶¶ 64-78; Exs. 39, 43, 57-61, 63-68.

Even if Rule 9(b) required Relators to identify specific instances where HCL underpaid H-1B wages and associated taxes, Relators have satisfied this requirement. *See* App.56, ¶ 73 (discussing Exs. 63 and 64) (discussing underpayment of 161+ specific H-1B visa workers).

Date: January 31, 2023

KOTCHEN & LOW LLP

*/s/Daniel Kotchen*
Daniel Kotchen

*Attorney for Appellants Billington, Aceves, and Dorman*

# CERTIFICATE OF COMPLIANCE

This brief or other document complies with type-volume limits of Fed. R. App. P. R. 32 and Local Rule 32.1(b) (7,000-word count limit) because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X] this brief or other document contains 6,881 words

[ ] this brief uses monospaced type and contains [state number of] lines

This brief or other document complies with the typeface and type style requirements because:

[X] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font; or

[ ] this brief or other document has been prepared in a monospaced typeface using [identify word processing program] in [identify font size and type style].

Dated: January 31, 2023

/s/Daniel Kotchen
Daniel Kotchen
Kotchen & Low LLP

*Attorney for Appellants*
*Billington, Aceves, and Dorman*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: January 31, 2023

KOTCHEN & LOW LLP

*/s/ Daniel Kotchen*
Daniel Kotchen

*Attorneys for Appellants Billington, Aceves, and Dorman*



Exhibit 1

<u>**SETTLEMENT AGREEMENT**</u>

**I.      Parties**

The United States Attorney's Office for the Eastern District of Texas, the United States Department of State ("State"), the United States Department of Homeland Security ("DHS") (collectively "United States"), and Infosys Limited ("Infosys") (collectively "Parties"), through their authorized representatives, have entered into this Settlement Agreement ("Agreement"), resolving all claims related to the matters specified herein.

**II.      Preamble**

As a preamble to this Agreement, the Parties agree to the following facts, except as noted below:

A.      Infosys is a corporation involved in consulting, technology, and outsourcing, located in thirty countries including the United States, and in seventeen cities in the United States, including a location at 6100 Tennyson Parkway, Suite 200, in Plano, Texas, in the Eastern District of Texas.  The Plano location is responsible for handling the immigration practices and procedures for the United States operations of Infosys.

B.      Infosys brings foreign nationals into the United States in order to perform work and fulfill contracts with its customers under two visa classification programs relevant to this matter, H-1B and B-1:

> 1.      The H-1B visa is a non-immigrant visa that allows an employer to temporarily employ a foreign national in a "specialty occupation."  A specialty occupation is one that requires a theoretical and practical application of a body of specialized knowledge and attainment of a bachelor's or higher degree or its equivalent in experience for the specific specialty.  The application process is highly regulated and requires the submission of a Labor Condition Application that describes the intended occupation and specific geographical place of employment and certifies that the salary of the proposed employee is commensurate with similarly employed United States workers, that the working conditions of the

proposed employees will not adversely affect the conditions of workers similarly employed, and that there is not a strike, lockout, or work stoppage at the company.  The annual cap for new H-1B visa issuances is 65,000.  The base fee for an H-1B application is $325 with an additional $500 Fraud Prevention and Detection fee.  Additional fees can include $1500 for the American Competitiveness and Workforce Improvement Act fee to fund the training of United States citizens and $2000 for an application by companies with more than 50 employees in the United States of which more than 50 percent are in H-1B or L-1 status.

2.	 The B-1 visa is a non-immigrant visa that allows a foreign national to temporarily enter the United States for business purposes.  Business purposes entail activities such as consulting with business associates; traveling for business conventions; negotiating a contract; participating in short term training, and certain other activities of a temporary nature incident to international trade or commerce.  It does not include local employment or labor for hire.  Pursuant to law and regulations, B-1 visa holders may not perform skilled or unskilled labor.   B-1 visas are valid for ten years, and the application fee for a B-1 visa is approximately $160.

C.	In connection with arranging travel for B-1 visa holders, Infosys generates or causes to be generated "invitation letters" stating that certain Infosys employees will travel to the United States in order to handle aspects of contracted business or other business activities.  These "invitation letters" are often submitted to and reviewed by U.S. Consular Officials and other immigration officials in support of the B-1 visa holder's travel into the United States.

D.	Infosys failed to maintain accurate I-9 records for many of its foreign nationals in the United States in 2010 and 2011 as required by law.  During that period, Infosys did not accurately complete a Form I-9 Employee Eligibility Verification Form for many persons that it employed in the United States and did not properly maintain I-9 forms, including a widespread failure to update and re-verify the employment authorization status of a substantial percentage of its foreign national employees.

E.      The United States further alleges as follows:

1.      The Immigration and Nationality Act indicates that a B-1 visa holder may not come to the United States to perform skilled or unskilled labor.  The controlling Code of Federal Regulation indicates that the term "business" as used by a B-1 visa holder does not include local employment or labor for hire.  The governing policies within the Department of State's Foreign Affairs Manual and the Department of Homeland Security's Inspector's Field Manual interpret permissible B-1 activities as an alien coming to the United State to engage in commercial transactions (e.g., buying or selling) that do not involve gainful employment in the United States; to negotiate contracts; to consult with business associates, including attending meetings of the Board of Directors of a U.S. corporation; to litigate; to participate in scientific, educational, professional, or business conventions, conferences or seminars; or to undertake independent research.

2.      To circumvent the requirements, limitations, and governmental oversight of the H-1B visa program, Infosys knowingly and unlawfully used B-1 visa holders to perform skilled labor in order to fill positions in the United States for employment that would otherwise be performed by United States citizens or require legitimate H-1B visa holders, for the purposes of increasing profits, minimizing costs of securing visas, increasing flexibility of employee movement, obtaining an unfair advantage over competitors, and avoiding tax liabilities.

3.      Infosys took, among others, the following unlawful actions, in furtherance of its unlawful scheme:

a.      Infosys submitted "invitation letters" to U.S. Consular Officials that contained materially false representations regarding the true purpose of a B-1 visa holder's travel in order to deceive U.S. Consular Officials and/or Customs and Border Protection Officers and secure entry of the visa holder into the United States.  These "invitation letters" often stated that the purpose of travel was for "meetings" or "discussions" when the true purpose was to engage in activities not authorized under a B-1 visa.  Examples from such invitation letters submitted to U.S. Consular Officials in order to mislead the officials are as follows:

(1)      An invitation letter submitted on or about July 3, 2008, relating to an individual known as MG, stated that the purpose of the trip was for "customer discussions and related business development activities," when, in fact, as known by Infosys, the purpose of the trip was to engage in activities not authorized under a B-1 visa, which included, but was not limited to, coding and programming.

(2)     An invitation letter submitted on or about July 15, 2009, relating to an individual known as SI, stated that the purpose of the trip was for "customer discussions and related business development activities," when, in fact, as known by Infosys, the purpose of the trip was to engage in activities not authorized under a B-1 visa, which included, but was not limited to, coding and programming.

(3)     An invitation letter submitted on or about May 5, 2010, relating to an individual known as AR, stated that the individual "would be involved in meetings and business discussions," when, in fact, as known by Infosys, the purpose of the trip was to engage in activities not authorized under a B-1 visa, which included, but was not limited to, coding and programming.

(4)     An invitation letter submitted on or about March 9, 2011, relating to an individual known as AS, stated that "the purpose of the trip was for meetings and discussions," when, in fact, as known by Infosys, the purpose of the trip was to engage in activities not authorized under a B-1 visa, which included, but was not limited to, coding and programming.

b.     Infosys provided instructions to B-1 visa holders regarding how to deceive U.S. Consular Officials and/or Customs and Border Protection Officers, including specific direction regarding the avoidance of certain terminology, the avoidance of contract terms, and the use of misleading job titles, in order to secure entry of the visa holder into the United States.  Examples from a "Do's and Don'ts" memorandum provided by Infosys to foreign nationals entering the United States on a B-1 visa included the following directions:

(1)     "Do not mention activities like implementation, design & testing, consulting, etc., which sound like work."

(2)     "Also do not use words like, [sic] work, activity, etc., in the invitation letter."

(3)     "Please do not mention anything about contract rates."

c.     Infosys directed foreign nationals to inform U.S. Consular Officials and/or Customs and Border Protection Officers that their destination in the United States was the same as that provided in

the Labor Condition Application; however, Infosys and the foreign nationals knew that the foreign nationals had been assigned to other destinations in the United States.  This was done in order to secure entry of the visa holder into the United States without requiring the submission of an additional Labor Condition Application and to avoid additional scrutiny by U.S. officials. Examples of such false representations are as follows:

(1)     On or about November 26, 2008, Infosys directed an individual known as ST to tell U.S. Consular Officials that he was destined for Seattle, Washington, consistent with the Labor Condition Application; however, his true destination was Henrico, Virginia.

(2)     On or about October 28, 2009, Infosys directed an individual known as VG to tell U.S. Consular Officials that he was destined for Seattle, Washington, consistent with the Labor Condition Application; however, his true destination was Bentonville, Arkansas.

(3)     On or about October 29, 2010, Infosys directed an individual known as SK to tell U.S. Consular Officials that he was destined for Beaverton, Oregon, consistent with the Labor Condition Application; however, his true destination was Sunnyvale, California.

(4)     On or about November 3, 2011, Infosys directed an individual known as BS to tell U.S. Consular Officials that he was destined for Houston, Texas, consistent with the Labor Condition Application; however, his true destination was Milwaukee, Wisconsin.

d.      In some circumstances, Infosys wrote and revised contracts with clients in order to conceal the fact that Infosys was providing B-1 visa holders to perform jobs that involved skilled or unskilled labor that were otherwise required to be performed by United States citizens or require legitimate H-1B visa holders.  For example, on or about September 29, 2009, in a series of emails between Infosys employees, Infosys directed its employees to convert a "time and materials contract" – a contract that disclosed the names and billing rates of all individuals working on a project – to a "fixed price contract" – a contract that disclosed only the total price for services performed.  This change allowed and was intended by Infosys to conceal the fact that B-1 visa holders were performing jobs that involved skilled or unskilled labor that were otherwise

required to be performed by United States citizens or require legitimate H-1B visa holders.

    e.    Infosys used B-1 visa holders to perform jobs that involved skilled labor that were instead required to be performed by United States citizens or required legitimate H-1B visa holders

F.    The matters set forth in paragraphs D and E shall be considered the "Covered Conduct."

G.    Infosys denies and disputes the allegations by the United States as set forth in paragraph E.  Infosys alleges as follows:

1.    Infosys's use of B-1 visas was for legitimate business purposes and not in any way to circumvent the requirements of the H-1B program.  Infosys has long been a significant and responsible participant in the H-1B program.  Infosys has never intended to, nor has it ever circumvented the requirements of the H-1B program.

2.    Under controlling authority and guidance from State, the former Immigration and Naturalization Service, DHS, and the Attorney General of the United States, there are four factors that determine whether a B-1 visa is appropriate for a given activity:  (i) the business activity must be international in scope; (ii) the source of remuneration and the principal place of business and actual place of profit accrual must be outside the United States; (iii) the alien must possess a clear intent to maintain a foreign residence; and (iv) the alien's entry into the United States to carry out business activities must be temporary.  Controlling authority on the use of B-1 visas, including State's Foreign Affairs Manual, permits the use of B-1 visa holders to conduct other activities in addition to those enumerated in Part II.E.1 of this Agreement provided that they are a necessary incident to international trade or commerce.  The B-1 travel conducted by Infosys and its employees in support of projects for its U.S.-based clients, including those specifically alleged by the United States and which involved coding and programming, was fully consistent with all applicable authority and guidance.

3.    The Infosys invitation letters were accurate and their level of detail was appropriate for their purpose in the B-1 visa application process.  The letters were consistent with common practice in the industry and they were accepted by U.S. Consular Officers.  No Consular Official was misled about the nature of the activities to be conducted by the B-1 traveler by any of the letters alleged by the United States or submitted in support of other B-1 visa applications.

4.      Memoranda providing instructions and guidance to B-1 visa holders regarding their interactions with U.S. officials are common in both industry and U.S. government agencies that sponsor B-1 travel.  The Infosys "Do's and Don'ts" memorandum described in Part II.E.3.b was not intended to deceive U.S. officials and, in any event, the Company ended the use of this memorandum in 2011.

5.      Infosys did not direct its employees to mislead or deceive U.S. officials as to locations in Labor Condition Applications, nor was there an effort to make false representations to avoid submission of additional Labor Condition Applications.

6.      All changes made to contracts or proposed contracts between Infosys and its clients, including that described in Part II.E.3.d, were made to comply with internal Company guidelines and rules regarding billing practices; all were agreed to by both Infosys and its clients; and none were made to deceive as to activities performed by B-1 visa holders.  In addition, Infosys did not engage in any improper billing of its clients in connection with projects involving B-1 visa holders.

H.      Based on its allegations in paragraphs D and E of this Agreement, the United States asserts that it has certain civil and criminal claims against Infosys arising under 18 U.S.C. §§ 371, 981, 982, and 1001; 8 U.S.C. § 1324a; 18 U.S.C. § 1546; and 31 U.S.C. § 3729.

I.      Based upon its contentions set forth in paragraph G of this Agreement, Infosys denies any allegations of civil or criminal wrongdoing and/or liability.

## III.     Infosys's Compliance

A.      Infosys has internal controls and compliance processes in the immigration area:

1.      In August 2010, Infosys began phasing in a new electronic I-9 system to replace the existing hard copy system and to enhance its compliance with its I-9 obligations.  After extensive training of its personnel and significant system improvements, Infosys completed transitioning the majority of its then-current employees to the electronic I-9 system, which included a re-verification of the work authorization of its employees, by mid-2011. Infosys currently uses the electronic system and a centralized employment authorization verification process to ensure that all of its employees' work authorization documentation is properly reviewed and re-verified as required by the relevant regulations.  In 2011 Infosys introduced a new I-9 policy to enhance compliance and keep its employees informed as to their

I-9 obligations and enrolled in the government's E-Verify Program to further verify its employees' work authorization.

2.    Infosys maintains an H-1B policy designed to ensure compliance with all applicable requirements, including accurate and current information regarding the H-1B visa holders' work locations in the United States. In November 2012, Infosys instituted additional procedures to ensure that accurate and up-to-date information regarding its employees' work locations is provided at all steps in the H-1B petition and visa approval process.

3.    In June and November 2011, Infosys made changes to its B-1 visa policy and the internal procedures its employees use to apply for those visas in order to strengthen its compliance with applicable regulations. These changes included: strict limits on the duration of any one B-1 trip and on the total number of days any one employee may spend in the United States on a B-1 visa in a given year; restrictions on which employees are permitted to travel on a B-1; training of employees and managers on Infosys's B-1 travel policy; new requirements for invitation letters; and requiring managers and travelers to make certifications to the Company regarding the nature of a proposed B-1 trip before applying for a B-1 visa.

B.    Infosys also maintains an internal process whereby it disciplines employees who violate applicable laws and/or Company policy. Infosys has disciplined employees under this process, including those who have violated immigration-related laws or policies.

C.    Infosys cooperated with the United States in its investigation, including by providing timely and extensive information in response to informal, as well as formal, requests for information from the United States.

D.    Based upon these factors, the United States believes:

1.    Infosys has instituted policies, standards of conduct and internal control systems to prevent violations of the immigration laws.

2.    The policies and standards of conduct instituted by Infosys in the I-9, H-1B, and B-1 areas seek to ensure that Infosys's employees will be in compliance with the immigration laws.

3.    Through the actions described above and by signing this Agreement, Infosys has demonstrated commitment to compliance with the immigration laws.

4.      Infosys has informed the United States that it intends to and will cooperate with the United States in connection with requests for follow-up information.

**IV.      Terms and Conditions**

In consideration of the promises, covenants, and obligations set forth below, and for consideration as set forth herein, the Parties agree as follows:

A.      Infosys agrees to pay a full settlement amount of $34,000,000.  The payment shall be made within thirty days of the execution of this Agreement.  Payment shall be made as follows:

1.      $5,000,000 to Homeland Security Investigations for civil or administrative forfeiture.  Infosys agrees to (a) waive all right, title, and interest to the funds to be forfeited; (b) waive any notice requirements established by law or the Constitution; and (c) not file a claim or otherwise contest any forfeiture proceeding.

2.      $5,000,000 to the Department of State for civil or administrative forfeiture.  Infosys agrees to (a) waive all right, title, and interest to the funds to be forfeited; (b) waive any notice requirements established by law or the Constitution; and (c) not file a claim or otherwise contest any forfeiture proceeding.

3.      $24,000,000 to the United States Attorney's Office for the Eastern District of Texas.

The United States will provide instructions for making these payments within ten days of this Agreement being executed.

B.      Upon its receipt of the full settlement amount specified in Part IV.A of this Agreement, the United States shall immediately file a motion to dismiss with prejudice the complaint that it will file in the Eastern District of Texas in connection with the Covered Conduct.

C.      Infosys agrees not to use non-specific invitation letters absent express written agreement from State.  As set forth in Infosys's current B-1 policy, established in 2011, each B-1 visa applicant must provide a detailed description of the activities that will be performed by that applicant at the time of each entry into the United States.  Infosys will retain a copy of this description for a period of three years and provide it to the United States upon its request.

D.      Infosys agrees that any materials that the government has obtained during its investigation may be used, in redacted form, by State and/or DHS for training aids and various outreach activities to industry members.

E.      Infosys agrees to retain, at its own expense, an independent third-party auditor or auditing firm to review and report on its I-9 compliance.  One year from the date this agreement is signed, and for one additional year, the auditor shall analyze a random sample of not less than four percent of Infosys's existing United States workforce to determine if the I-9 forms associated with the workforce have been completed and maintained in full compliance with the requirements of 8 U.S.C. § 1324a.  The independent auditor or auditing firm must submit a signed report to the United States Attorney for the Eastern District of Texas regarding the results of the analysis within 60 days of the first and second anniversaries of the signing of this Agreement.

F.      Infosys agrees that it will submit a report to the United States Attorney for the Eastern District of Texas, within 60 days of the first anniversary of the signing of this Agreement describing whether its B-1 visa use policies, standards of conduct, internal controls, and disciplinary procedures have been effective in ensuring compliance with paragraph III.A.3 of this Agreement.  Infosys also understands that, for two years after the date of the signing of this Agreement, the United States will review random samples of documents that Infosys has

submitted to U.S. Consular officials and other immigration officials in support of its B-1 visa

holders to determine whether Infosys remains in compliance with this Agreement.

G.      Infosys agrees that it committed civil violations of 8 U.S.C. § 1324a(a)(1)(B) as

alleged in part II.D of this Agreement, and agrees to cease and desist from any further violations

of 8 U.S.C. § 1324a.  Infosys understands and agrees that these violations will be considered

"previous violations" pursuant to 8 U.S.C. § 1324a(e)(5), and that any future violations of 8

U.S.C. § 1324a(a)(1)(B) may be subject to enhanced penalties.

H.      The United States represents that there are no pending investigations by the

Department of Justice, State or DHS concerning compliance with employee verification and H-

1B and B-1 laws and regulations other than the ones resolved by this Agreement, including any

*qui tam* action.  The United States agrees that it will not use the Covered Conduct or its

investigations of the Covered Conduct to revoke any existing visas or petitions or deny future

visas or petitions for Infosys foreign nationals, but that each visa or petition will be evaluated on

its own individual merits.  The United States agrees that State will not use the Covered Conduct

or its investigation of the Covered Conduct to debar or suspend Infosys from any B-1 or H-1B

immigration program.  The United States also agrees that it will not make any referrals to any

agencies for debarment or suspension proceedings related to the Covered Conduct.  The United

States further agrees that it will provide information on Infosys's behalf concerning its

cooperation and compliance should any such proceedings arise.

I.      The United States and Infosys may, each at their discretion, disclose the terms of

the Complaint and this Agreement, as well as the Complaint and Agreement themselves, to the

public.

J.      Infosys releases the United States and each of its agencies, officers, agents, employees, and contractors and their employees from any and all claims, causes of action, adjustments, and set-offs of any kind arising out of or pertaining to the Covered Conduct, including the investigation of the Covered Conduct and this Agreement.

K.      Subject to the exceptions in Part III.L of this Agreement, in consideration of the obligations of Infosys set forth in this Agreement, the United States agrees to release Infosys and each of its current and former employees, directors, officers, agents, and contractors from any civil, administrative, or criminal claims the United States has or may have arising out of or pertaining to the Covered Conduct.

L.      Notwithstanding any other terms of this Agreement, this Agreement specifically reserves and excludes from its scope any and all of the following:

1.  Any civil, criminal, or administrative claims, investigations or prosecutions arising under Title 26 of the United States Code or any regulations promulgated under the authority of any statute contained therein;

2.  Any liability to the United States (or its agencies) for any conduct other than that arising out of or pertaining to the Covered Conduct; and

3.  Any claims based upon such obligations as are created by this Agreement.

M.      Each party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

N.      Infosys represents that it has freely and voluntarily entered into this Agreement without any duress or compulsion whatsoever, and that Infosys has obtained the appropriate corporate authorizations to enter into this Agreement.

O.      This Agreement is governed by the laws of the United States.

P.      In the event of breach of this Agreement, civil, criminal, and/or administrative charges may be brought against Infosys for the Covered Conduct.

Q.     The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement will be the United States District Court for the Eastern District of Texas.

R.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

Agreed:

**On behalf of the United States:**          **On behalf of Infosys, Limited:**


John M. Bales
United States Attorney
Eastern District of Texas

Nithyanandan Radhakrishnan
Senior Vice President and General Counsel
Infosys, Ltd

Shamoil T. Shipchandler
Assistant United States Attorney
101 East Park Boulevard, Suite 500
Plano, TX 75074
tel: (972) 509-1201


David M. Marwell
Special Agent in Charge, Dallas Field Office
Homeland Security Investigations

Stephen A. Jonas
WilmerHale
60 State Street
Boston, MA 02109
tel: (617) 526-6144
Counsel for Infosys Limited


George Nutwell
Special Agent in Charge, Houston Field Office
Bureau of Diplomatic Security
U.S. Department of State

Date:   October 30, 2013